Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 1, 2021

**2021 CO 39**

**No. 20SC498, *People in Int. of B.H.*—Dependency & Neglect—Termination of Parental Rights—The Uniform Child-custody Jurisdiction and Enforcement Act—The Right to Counsel in Termination Proceedings—Elimination of Less Drastic Alternatives to Termination.**

A father directly appeals a district court order terminating his parental relationship with his son, asserting that the court lacked subject matter jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act. Since the record suggests the existence of a prior child-custody determination in Indiana, the supreme court vacates the termination order and remands the case for additional jurisdictional factfinding.

Father also argues that the district court violated his right to counsel by requiring him to proceed pro se at the termination hearing. The supreme court concludes that the right to due process did not require the appointment of a third attorney because the risk of an erroneous deprivation of his parental rights was low. Further, father voluntarily waived his statutory right to counsel through his obstreperous and dilatory conduct.

Finally, father argues that the district court abused its discretion when it found that the Arapahoe County Department of Human Services had made reasonable efforts to reunite his family. The supreme court finds no abuse of discretion.

.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 39

## Supreme Court Case No. 20SC498

*C.A.R. 50 Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA2286
Arapahoe County District Court Case No. 18JV623
Honorable Natalie T. Chase, Judge

### Petitioners:

The People of the State of Colorado,

In the Interest of Minor Child: B.H.;

and

B.H., Minor Child,

v.

### Respondent:

D.H.

## Judgment Affirmed in Part and Vacated in Part

*en banc*
June 1, 2021

**Attorneys for Petitioner the People of the State of Colorado:**
Arapahoe County Attorney's Office
Kristi Erickson, Assistant County Attorney
Michael Valentine, Assistant County Attorney
    *Aurora, Colorado*

**Attorneys for Petitioner B.H.:**
Bettenberg, Maguire & Associates, LLC
Alison A. Bettenberg, Guardian ad litem
Sheena Knight, Guardian ad litem
*Centennial, Colorado*

**Attorneys for Respondent D.H.:**
The Saroyan Law Firm, L.L.C.
Zaven T. Saroyan
*Colorado Springs, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1 Shortly after B.H.'s parents brought him to Colorado, the state placed the two-year-old with a foster family. S.L.C. ("mother") was experiencing homelessness and abusing alcohol, and D.H. ("father") was struggling with mental health issues and continually returned B.H. to mother. Mother visited B.H. the day of the removal order and then never again. Father made early progress with his treatment plan, but then threatened to kill his lawyer, B.H.'s lawyer, and a caseworker after father lost his job and housing. The day after the threats, father was arrested with a gun, ammunition, body armor, and methamphetamine in his car.

¶2 This opinion, issued the same day as *People in Interest of S.A.G.*, 2021 CO 38, __ P.3d __, resolves father's appeal from the termination of his parental rights. Both cases interpret the Uniform Child-custody Jurisdiction and Enforcement Act ("UCCJEA"). Having granted certiorari review under C.A.R. 50, in this instance, we review the judgment of the district court.

¶3 Unlike *S.A.G.*, this case concerns the jurisdictional effect of a potential prior child-custody determination from a different state. We hold that if an out-of-state court issued an order returning physical custody of a child to the parents, that satisfies the UCCJEA's definition of "child-custody determination." So, a Colorado court seeking to modify such an order must follow the UCCJEA's procedures for acquiring modification jurisdiction. Since the record suggests that

such an order exists and the district court didn't acquire jurisdiction to modify it, we vacate the termination order and remand the case to the district court for further jurisdictional factfinding.

¶4 This case also involves the separate issue of the constitutional and statutory protections that Colorado owes to indigent parents when it seeks to terminate their parental rights; namely, the right to appointed counsel and the district court's duty to eliminate less drastic alternatives to termination. We conclude that the district court did not violate father's due process rights by declining to appoint him a third attorney. Similarly, we conclude that the district court did not violate father's statutory right to appointed counsel because father had impliedly waived it through his obstreperous and dilatory conduct. Finally, we see no abuse of discretion by the district court when it concluded that there were no less drastic alternatives to termination.

## I. Facts and Procedural History

¶5 In July 2018, the Arapahoe County Department of Human Services ("Department") learned that mother was experiencing homelessness and had been driving drunk with her two-year-old son, B.H.

¶6 In August 2018, the Arapahoe County District Court issued a verbal removal order for B.H., citing those issues as well as concerns about father.

4

¶7 The Department believed that father had mental health issues and had repeatedly given B.H. to mother despite her inability to care for him. The Department placed B.H. with a foster family and filed a petition alleging that he was dependent or neglected. *See* § 19-3-502, C.R.S. (2020).

¶8 The Department wasn't the first child-welfare agency to take B.H. from his parents. In June 2016, he was the subject of an Indiana dependency and neglect proceeding. B.H. lived with an Indiana foster family for almost a year before he was reunited with his parents in April 2017. The record is silent on the details of this proceeding.

¶9 Record evidence suggests that mother and B.H. moved from Indiana to Colorado in April 2018 and that father followed in May. Father asserts that he came to Colorado only temporarily, pointing to his November 2018 statement that "[his] focus is getting through this process, [to] get [his] child home and leave the state of Colorado and return home to—to [their] home in Indiana." The record also contains a statement from father's mother that he has a home and car in Indiana.

¶10 The People and B.H.'s guardian ad litem ("GAL") doubt the April and May arrival dates, claiming that parents' other Colorado dependency and neglect cases for different children suggest that they reached the state earlier. The People and the GAL also argue that both parents moved here permanently, citing, among

other evidence, father's Colorado employment and the Colorado address that he listed on his application for court-appointed counsel.

¶11 In September 2018, father admitted to the district court that B.H. had been without proper care, so the court adjudicated B.H. dependent and neglected. *See* § 19-3-505(7)(a), C.R.S. (2020). The court adopted a treatment plan that required father to maintain housing and employment, to develop a positive relationship with B.H. through visitation, to undergo a psychological evaluation and complete any recommended treatment, and to cooperate with the Department. *See* § 19-3-508(1)(e)(I), C.R.S. (2020).

¶12 Father notched some early successes with his plan, but he lost his job and housing around January 2019 and disclosed that he was sneaking into a drug house at night to sleep. He began to behave erratically in front of B.H., causing his son to become dysregulated for hours after their visits. When the parenting coach intervened, father reportedly confronted her aggressively. Father began to express suicidal thoughts and then, in April 2019, he threatened to kill his court-appointed lawyer, the Department caseworker, and the GAL. The day after those threats, the police arrested him and found a gun, ammunition, body armor, and methamphetamine in his car. The court suspended visits due to safety concerns, and the visits never resumed because father didn't attend court-ordered

counseling. In September 2019, the Department filed a motion to terminate his parental rights. *See* § 19-3-602, C.R.S. (2020).

¶13 The court allowed father's first counsel to withdraw after the death threat and appointed a second attorney with whom father refused to cooperate, as father alleged that the lawyer was secretly working for father's mother. Father attempted to fire this lawyer in August 2019, but the lawyer didn't communicate that request to the court. Father didn't have an opportunity to tell the court himself because he had been arrested on drug charges right before his September hearing, and, while in custody, he hadn't been transported to court for his November pre-trial conference for the termination hearing.

¶14 At the beginning of the termination hearing, father passed his lawyer a note reiterating his desire to discharge him. The lawyer showed the note to the court, and the court characterized the situation as a mere "disagree[ment]" that didn't rise to the level of an ethical conflict meriting a new attorney. Nonetheless, the court organized a closed hearing before a different judge so that father could make his case without affecting the termination hearing.

¶15 At the closed hearing, father told the other judge that he didn't "have a problem" with his lawyer but that they had "never clicked" and he wanted a new attorney appointed. The judge found that father had been "unequivocal about his intent to discharge" and allowed it. The judge told father that "we're going to go

7

to number three," that he "believe[d]" that the trial judge would appoint another attorney, that he'd convey that request to her, and that she'd "pick up from there."

¶16 When the termination hearing resumed, the original, presiding court refused to appoint a replacement attorney, ruling that father "does not have a right to have a third court-appointed attorney when it has been his actions that have caused the numerous attorneys to have to withdraw." The court found that threatening the first lawyer was an attempt to "play the system." Marking father's note as an exhibit, the court also found that father had "create[d] [his] own conflict of interest" with the second attorney. Finally, the court found that "this was an attempt to delay the proceedings," so denying father a third counsel was "in the best interest of the minor child . . . and potentially other court-appointed attorneys."

¶17 After two days of testimony, the court concluded that father hadn't complied with any aspect of his treatment plan:

- He "had been homeless the majority of his case or in and out of his car" and was "currently in custody, which is not stable housing for a minor child."

- He had been "dismissed from his work because he got in an argument," "[h]e's currently incarcerated so he's not able to have employment," and there had been no documentation of employment for about ten months.

- He hadn't visited B.H. in more than nine months, there was no good cause for this failure, and it wasn't "safe or appropriate" for him to have contact with B.H.

8

- He hadn't completed any of his psychological treatment recommendations successfully, didn't appreciate his need for therapy, and had "disclosed using meth during the life of this case."

- He had repeatedly threatened Department staff, causing them to "fear[] for their li[ves]."

¶18 The court found that father was unfit because he wasn't willing and able to meet B.H.'s needs despite the Department's reasonable efforts to help him. The gap between father's capacity and B.H.'s needs was especially large because B.H. has a developmental disability and had suffered "severe trauma." The court also found that father wouldn't become fit within a reasonable period of time. Therefore, the court terminated his parental rights. *See* § 19-3-604(1)(c), C.R.S. (2020).[1]

¶19 Along the way, the district court rejected less drastic alternatives to termination. It categorically dismissed an allocation of parental responsibilities because B.H. needed the "stability" of an adoption, contact with father was unsafe, and father was a danger to any potential placement. In particular, the court cited an incident in which father had gone to B.H.'s foster home and screamed at the foster parents for six hours.

---

[1] The court also terminated mother's parental rights, and she has not appealed.

¶20 The court specifically rejected any arrangement involving father's mother, who, years earlier, had lost custody of father in her own dependency and neglect case. Although Illinois (where father's mother lives) had approved an Interstate Compact on the Placement of Children request for her on the condition that she complete mental health therapy, the court doubted her "perception of reality" because she insisted that the Department and the foster family had "given [B.H.] drugs" and "coached and groomed" him so that he could "be[] trafficked" and would let people "tak[e] pictures of him." The court also found that she wouldn't be a "safe and appropriate person to give [B.H.] to" since "[s]he does not believe the minor child has significant needs" and "she wouldn't follow a [hypothetical] court order of no contact between herself and [father]."

¶21 Father appealed, arguing that the UCCJEA deprived the district court of subject matter jurisdiction to terminate his parental rights, that the court should have appointed a third attorney, and that the court abused its discretion when it found that the Department had made reasonable efforts to reunite his family.

¶22 The People and the GAL jointly petitioned this court under C.A.R. 50 to review this case alongside *S.A.G.* We accepted jurisdiction.[2]

---

[2] The issues we agreed to review are:

## II. Analysis

¶23    We begin with whether the district court had subject matter jurisdiction to enter the termination order.  Next, we review whether the district court violated father's right to appointed counsel.  Finally, we address father's allegations that the Department failed to explore a reasonable number of placement options and mail out family finding letters.

## A.  The UCCJEA

¶24    Father says the district court lacked jurisdiction when it terminated his parental rights because there was a previous child-custody determination from Indiana and the district court failed to follow the UCCJEA's process for assuming jurisdiction to modify that determination.  Father also asserts that Indiana was

---

1.  Whether the juvenile court had jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act ("UCCJEA") to order termination of the parent-child legal relationship.

2.  Whether the District Court violated Father's right to due process when it denied him counsel at the termination hearing.

3.  Whether the District Court abused its discretion when it found the department made reasonable efforts to reunite the family despite the department failing to mail out family finding letters and explore a reasonable number of placement options as a less drastic alternative to the termination of Father's parental rights.

B.H.'s home state, so the UCCJEA required the district court to ask the Indiana court to decline jurisdiction before it could acquire jurisdiction.

¶25 The People and the GAL counter that what happened in Indiana doesn't qualify as a prior child-custody determination, so there was no need to obtain jurisdiction to modify. They also argue that the court properly exercised "significant-connection" jurisdiction because B.H. had no home state when this proceeding began.

¶26 Although we stop short of concluding that there was a prior child-custody determination in Indiana, the record suggests as much, as we explain below. Therefore, we remand this case to the district court for additional jurisdictional factfinding.

### 1. Standard of Review

¶27 We review de novo whether a district court had subject matter jurisdiction over a child-custody proceeding. *Brandt v. Brandt*, 2012 CO 3, ¶ 18, 268 P.3d 406, 410. Although father did not raise this issue below, "lack of [subject matter] jurisdiction can be raised for the first time on appeal." *People in Int. of C.L.T.*, 2017 COA 119, ¶ 13, 405 P.3d 510, 513.

## 2. Jurisdiction to Modify a Prior Child-Custody Determination

¶28 The UCCJEA is a "limiting statute" that "offers Colorado courts two ways to employ their power to . . . issue a 'child-custody determination'": temporary emergency and non-emergency jurisdiction. *S.A.G.*, ¶¶ 23–24.

¶29 The parties agree that the termination order required non-emergency jurisdiction. In the absence of temporary emergency jurisdiction, section 14-13-203(1), C.R.S. (2020), provides that "a court of this state may not modify a child-custody determination made by a court of another state unless" the Colorado court complies with that section.[3] Section 14-13-203(1) requires the Colorado court to acquire either "home-state" or significant-connection jurisdiction under section 14-13-201(1)(a) or (b), C.R.S. (2020).[4] Additionally, one of three things needs to

---

[3] The parties' briefs did not explicitly address the modification jurisdiction statute, section 14-13-203, but the parties debated whether the facts of this case are analogous to those of *C.L.T.*, ¶¶ 31, 38, 405 P.3d at 515–17, a case that applied section 14-13-203, and father's attorney raised section 14-13-203 at oral argument. Moreover, we believe that our discussion of modification jurisdiction does not run afoul of the party-presentation principle given the scope of the issues that the parties have placed before us. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("The party presentation principle is supple, not ironclad."). Finally, we note that the principle of party presentation "does not prevent a court from properly characterizing an issue that has been improperly characterized by a party." *Lucero v. People*, 2017 CO 49, ¶ 26, 394 P.3d 1128, 1134.

[4] The UCCJEA provides for two other forms of non-emergency jurisdiction ("more-appropriate-forum" and "last-resort" jurisdiction), but section 14-13-203(1) provides that a court may modify an out-of-state child-custody determination only if it has home-state or significant-connection jurisdiction.

happen: (1) the out-of-state court *or* the Colorado court must determine that "the child, the child's parents, and any person acting as a parent do not presently reside in the other state"; (2) the out-of-state court must determine that those same people lack a significant connection to the other state and there isn't substantial evidence of the child's welfare there; or (3) the out-of-state court must find that Colorado would be the more convenient forum. § 14-13-203(1) (cross-referencing §§ 14-13-202, -207, C.R.S. (2020)); *see also C.L.T.*, ¶ 31, 405 P.3d at 515–16.

¶30 Fleshing out these requirements, we start with the two ways to acquire home-state jurisdiction:

> A court has home-state jurisdiction if Colorado was "the home state of the child [at] the commencement of the proceeding." § 14-13-201(1)(a). "'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least [182] consecutive days immediately before the commencement of a child-custody proceeding," and includes any "period of temporary absence." § 14-13-102(7)(a). Home-state jurisdiction also exists "if the child lived in [Colorado] for a consecutive [182-day] period . . . at any time during the [182 days] before the filing of the custody proceeding" and the child is absent from Colorado but a parent (or person acting as parent) still lives here. *In re Parental Resps. Concerning L.S.*, 257 P.3d 201, 208 (Colo. 2011).

*S.A.G.*, ¶ 26 (alterations in original).

¶31 In contrast, significant-connection jurisdiction exists when

> "[t]he child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with [Colorado] other than mere physical presence"; "[s]ubstantial evidence is available in [Colorado] concerning the child's" welfare; and either no court of another state has home-state jurisdiction or a

14

court of the home state "has declined to exercise jurisdiction on the ground that [Colorado] is the more appropriate forum."

*Id.* (alterations in original) (quoting § 14-13-201(1)(b)).

¶32 Even after acquiring home-state or significant-connection jurisdiction, the only way for a Colorado court to assert modification jurisdiction without the agreement of the out-of-state court that issued the prior child-custody determination is for the Colorado court to find that the child and parents don't "presently reside" in the other state. § 14-13-203(1)(b). That phrase "necessitates an inquiry broader than 'technical domicile' into the totality of the circumstances that make up domicile—that is, a person's permanent home to which he or she intends to return to and remain." *Brandt*, ¶ 3, 268 P.3d at 408. Mere "physical presence" isn't dispositive:

> Factors . . . include . . . the length and reasons for the parents' and the child's absence from the issuing state; their intent in departing from the state . . . ; reserve and active military assignments affecting one or both parents; where they maintain a home, car, driver's license, job, professional licensure, and voting registration; where they pay state taxes; the issuing state's determination of residency based on the facts and the issuing state's law; and any other circumstances demonstrated by evidence in the case.

*Id.*

¶33 The out-of-state court needn't assent to the Colorado court's finding on present residence, but "before a court of this state may assume jurisdiction to modify an out-of-state custody order, the court must [at least] communicate with

15

the issuing state pursuant to sections 14-13-110 to -112." *Id.* at ¶ 35, 268 P.3d at 413; *accord C.L.T.*, ¶ 23, 405 P.3d at 514–15 ("If a Colorado court learns . . . that an out-of-state custody order has been entered, the Colorado court must communicate with the court of the other state before continuing.").[5]

### 3. Existence of a Prior Child-Custody Determination

¶34 The UCCJEA defines "child-custody determination" expansively: "a judgment, decree, or other order of a court providing for the legal custody or physical custody of a child or allocating parental responsibilities . . . or providing for visitation [or] parenting time," including "a permanent, temporary, initial, [or] modification order." § 14-13-102(3), C.R.S. (2020).

¶35 Since "child-custody determination" includes even "temporary" orders "providing for . . . physical custody," it appears that the Indiana court issued at least two: one when it sent B.H. to the Indiana foster family and another when it sent him home. *See* § 14-13-102(3); *see also* § 14-13-102(14) ("'Physical custody' means the physical care and supervision of a child.").

¶36 The People and the GAL argue that any orders from the Indiana court wouldn't qualify as child-custody determinations because B.H.'s reunification

---

[5] The Colorado court must also "conduct a hearing at which both sides are allowed to present evidence if there is a factual dispute on the residency issue." *Brandt*, ¶ 35, 268 P.3d at 413.

16

with his parents coincided with the dismissal of the Indiana action. But we doubt that the Indiana court could have accomplished the transfer of physical custody back to B.H.'s parents without an order that meets the statutory definition of "child-custody determination." In Colorado, "[w]hen the court finds that the allegations of the [dependency or neglect] petition are not supported . . . , the court shall order . . . the child discharged from any detention or restriction previously ordered." § 19-3-505(6).

¶37 Further, we have interpreted very similar definitions of "custody determination" to focus on orders' "effect[s]." *G.B. v. Arapahoe Cnty. Ct.*, 890 P.2d 1153, 1157, 1160 (Colo. 1995) (involving the statute that preceded the UCCJEA and the federal Parental Kidnapping Prevention Act). A temporary restraining order was a custody determination when it effectively granted exclusive custody to one parent, even after the order was amended to omit explicit references to custody. *Id.* So, an order dismissing a dependency and neglect case is a "child-custody determination" if it had the effect of returning physical custody to a child's parents.

¶38 If an Indiana order effectively returning physical custody to B.H.'s parents exists, the district court never acquired jurisdiction to modify it because the district court didn't follow the relevant UCCJEA procedures. *See* § 14-13-203(1). The only way for the district court to have wrested jurisdiction away without some action

17

by the Indiana court would have been for it to find that B.H. and his parents didn't presently reside in Indiana, which we have held requires contacting the out-of-state court. *See id.*; *Brandt*, ¶¶ 3, 35, 268 P.3d at 408, 413. That didn't happen.

¶39    We stop short, however, of finding that the Indiana court issued a child-custody determination because "[o]ur role does not include fact finding." *Brandt*, ¶ 51, 268 P.3d at 416. The record doesn't reveal the legal mechanism that caused B.H. to reunify with his parents, and the Department told the district court that it "d[id]n't know whether or not a custody order was issued." It would be inappropriate for us to fill in that blank.

¶40    Confronted with the possibility that a trial court lacked jurisdiction to modify a prior child-custody determination plus a "record [that] contains at least some indication" of such a prior determination, a division of the court of appeals held that "the judgment must be vacated, and the case must be remanded for further proceedings to determine jurisdiction." *C.L.T.*, ¶ 41, 405 P.3d at 517. In *C.L.T.*, a child-welfare agency "reported that [certain] Texas proceedings were 'closed,' but the court was not told whether the proceedings were closed with a 'child[-custody determination]' as defined by the UCCJEA." ¶ 33, 405 P.3d at 516. We take the same approach here. This resolution also accords with the result of *S.A.G.*: Record evidence tending to suggest that a court didn't have non-emergency UCCJEA jurisdiction requires appellate courts "to 'vacate the trial

18

court's order . . . and remand [the] case for the trial court to conduct a full analysis under Colorado's UCCJEA, section 14-13-201.'" *S.A.G.*, ¶ 45 (alteration in original) (quoting *Madrone v. Madrone*, 2012 CO 70, ¶ 18, 290 P.3d 478, 482).

¶41     On remand, "the court may require a party . . . to provide additional information under oath.  And the court may examine the parties under oath 'as to details of the information furnished and other matters pertinent to the court's jurisdiction . . . .'"   *C.L.T.*, ¶ 35, 405 P.3d at 516 (quoting § 14-13-209(3), C.R.S. (2020)).

¶42     If it turns out that there was an Indiana order effectively shifting physical custody of B.H., then the district court will need to comply with the procedures of section 14-13-203(1).  Those procedures require certain actions by the Indiana court or a finding by the Colorado court that the family no longer presently resides in Indiana.  § 14-13-203(1).  The court will also need to acquire either home-state or significant-connection jurisdiction.  *See id.*  It would have home-state jurisdiction only if it finds that B.H. came to Colorado more than six months before this proceeding began.   *See* § 14-13-201(1)(a).  Significant-connection jurisdiction would require findings that B.H. and his parents have significant connections to Colorado and that substantial evidence exists here of his welfare.   *See* § 14-13-201(1)(b).

19

¶43 Unlike *S.A.G.*, this case doesn't implicate the other requirement for significant-connection jurisdiction: that the Colorado court invite any out-of-state court with home-state jurisdiction to decline to exercise that jurisdiction. *See id.*; *S.A.G.*, ¶¶ 48–51. Indiana has lost home-state jurisdiction because B.H. hasn't lived there for the last six months and Indiana's definition of "home state" doesn't excuse temporary absences of children. *See* Ind. Code Ann. §§ 31-21-2-8, -5-1(a)(1) (West 2021).[6] In contrast, in *S.A.G.*, it was possible that Arkansas still had home-state jurisdiction on the date of the termination order because Arkansas's definition of "home state" ignores a child's temporary absences and it was conceivable that the child's entire stay in Colorado had been a temporary absence from Arkansas. *S.A.G.*, ¶ 43.

¶44 But if the district court finds that the Indiana court never issued a child-custody determination that had the effect of shifting physical custody of B.H. back to his parents, then the district court could take any of the four paths to non-

---

[6] The district court should consider whether any court could *presently* invoke home-state jurisdiction over B.H. in Indiana—not whether it had home-state jurisdiction when the Colorado proceeding began—because section 14-13-201(1)(b) turns on whether another state has home-state jurisdiction at the moment that the Colorado court is seeking to assert significant-connection jurisdiction. *See S.A.G.*, ¶ 41. Indeed, it wouldn't make sense for a Colorado court to ask an Indiana court to decline to exercise home-state jurisdiction that it no longer has. *See id.*

emergency UCCJEA jurisdiction. *See* § 14-13-201(1) (providing for home-state, significant-connection, more-appropriate-forum, and last-resort jurisdiction).

¶45 In sum, it would be inappropriate for us to find that a prior child-custody determination exists. If the Indiana court did issue such an order, then the district court didn't acquire jurisdiction to modify it, and, on remand, it will need to follow the procedures of section 14-13-203(1). If not, then the district court will need to acquire jurisdiction under section 14-13-201(1). "If the [district] court does acquire non-emergency jurisdiction . . . , it may reinstate the termination judgment based on the existing record." *S.A.G.*, ¶ 58.

## B. The Right to Appointed Counsel

¶46 Next, father argues that the district court violated his due process and statutory rights to appointed counsel. Specifically, he says that requiring him to proceed pro se at the termination hearing was fundamentally unfair. Father also contends that his release of the second attorney was involuntary because he'd been led to believe he'd get another.

¶47 The People and the GAL counter that father had no due process right to appointed counsel under the balancing test from *C.S. v. People*, 83 P.3d 627, 636–37 (Colo. 2004), because the risk of an erroneous termination of parental rights was low. They also argue that the dismissal of the second attorney was voluntary

21

because the judge in the closed hearing made clear that the trial judge would have the final say on whether to appoint a third attorney.

¶48 We agree with the People and the GAL that father had no due process right to a third attorney because the risk of error was low. And, based on the totality of the circumstances, father impliedly and voluntarily waived his statutory right to counsel through his obstreperous and dilatory conduct.

## 1. Standard of Review

¶49 "We review procedural due process claims de novo." *People in Int. of C.J.*, 2017 COA 157, ¶ 25, 410 P.3d 839, 842.

¶50 The "waiver of counsel is a mixed question of fact and law." *People v. Bergerud*, 223 P.3d 686, 693 (Colo. 2010) (quoting *People v. Alengi*, 148 P.3d 154, 159 (Colo. 2006)). Although we have said that challenges to effective waiver call for de novo review, *id.*, it would be more complete to say that "[w]e accept the trial court's findings of historic fact if those findings are supported by competent evidence, but we assess the legal significance of the facts de novo," *People v. Thompson*, 2021 CO 15, ¶ 15, __ P.3d __ (alteration in original) (quoting *People v. Coke*, 2020 CO 28, ¶ 10, 461 P.3d 508, 512); *see also People in Int. of A.J.L.*, 243 P.3d 244, 249–50 (Colo. 2010) ("[T]he correct legal standard . . . is a matter of law. . . . The credibility of witnesses[;] the sufficiency, probative value, and weight of the

22

evidence[;] and the inferences and conclusions to be drawn from it are within the trial court's discretion.").[7]

## 2. Procedural Due Process

¶51    A court may terminate parental rights when "(1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan . . . ; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time." *People in Int. of A.M.*, 2021 CO 14, ¶ 19, 480 P.3d 682, 687; *see also* § 19-3-604(1)(c). "An unfit parent is one whose conduct or condition renders him or her unable to give a child reasonable parental care." *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006) (quoting *People in Int. of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003)). "A reasonable time . . . must be determined by considering the child's conditions and needs." *People in Int. of S.K.*, 2019 COA 36, ¶ 75, 440 P.3d 1240, 1254. "Implicit in these criteria is the requirement that the trial court consider and eliminate less drastic alternatives." *A.M.*, ¶ 19, 480 P.3d at 687. "[I]f a proposed alternative to termination is to be

_____

[7] *Bergerud* discussed the standard of review for the waiver of the constitutional right to counsel, but we don't decide whether a more deferential standard applies to the waiver of statutory rights because giving more deference to the district court wouldn't lead to a different result here. *Compare Bergerud*, 223 P.3d at 693, *with People in Int. of M.G.*, 128 P.3d 332, 334 (Colo. App. 2005) ("[W]e consider whether the record supports the trial court's factual finding of a voluntary waiver [of a statutory right to counsel].").

23

deemed viable, it must not only be adequate, it must be in the child's best interests." *Id.* at ¶ 27, 480 P.3d at 688.

¶52    Generally, "a parent's right to counsel in a termination proceeding is a statutory right and not a constitutional one," *C.S.*, 83 P.3d at 631, but "termination proceedings [do] cue constitutional due process concerns," *A.L.L. v. People*, 226 P.3d 1054, 1062 (Colo. 2010). "When the [s]tate moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982).

¶53    In *C.S.*, we embraced the test from *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981), for when fundamental fairness requires the appointment of counsel for an indigent parent in a termination proceeding. *C.S.*, 83 P.3d at 636–37. In *Lassiter*, the Supreme Court identified a "presumption that there is a right to appointed counsel only where the indigent [parent], if he is unsuccessful, may lose his personal freedom." 452 U.S. at 27. So, when there's no risk to a respondent parent's personal freedom, due process doesn't require the appointment of counsel in a case involving the termination of parental rights unless the presumption of no entitlement to counsel is overpowered by the "net weight" of the three factors from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Lassiter*, 452 U.S. at 27, 31–32. Those factors, which tell courts how much process is due,

24

are "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Id.* at 27.

¶54 We have interpreted that standard to "require[] the appointment of counsel only where the parent's interests are at [their] strongest, where the state's interests are at their weakest, *and the risks of error are at their peak*." *C.S.*, 83 P.3d at 637 (emphasis added).

¶55 Thus, father's due process claim fails if the risk of an erroneous result at his termination hearing was low. If so, we need not delve into his "commanding" interest in his parental status, *see Lassiter*, 452 U.S. at 27, or the state's interests.

¶56 The Supreme Court has articulated factors that affect the risk of erroneous termination: whether "the weight of the evidence . . . was sufficiently great that the presence of counsel . . . could not have made a determinative difference," cooperation with previous counsel, the availability of other procedural safeguards, "the complexity of the proceeding" (such as the presence of "expert witness[] testi[mony]" and "specially troublesome points of law"), and "the incapacity of the uncounseled parent." *Id.* at 28, 31–33.

¶57 In the ordinary course, forcing an indigent parent to participate pro se in a termination hearing presents a high risk of error that threatens the proceeding's fundamental fairness. *See Hughes v. Div. of Fam. Servs.*, 836 A.2d 498, 509 (Del. 2003) ("[T]his third factor will routinely require the appointment of counsel at

[s]tate expense for indigent parents in every dependency and neglect proceeding to ensure that an erroneous result does not occur."); *cf. A.R. v. D.R.*, 2020 CO 10, ¶ 66, 456 P.3d 1266, 1281–82 (stating that "a court may presume prejudice . . . when counsel was not made available" in a dependency and neglect proceeding). Although parents may be uniquely well-informed on their relationships with their children,

> the ultimate issues with which a termination hearing deals are not always simple . . . . Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation.

*Lassiter*, 452 U.S. at 30.

¶58    Yet the particular facts may combine to minimize the risk of an erroneous termination. In *C.S.*, for example, the trial court had refused to give a mother time to find a lawyer after it allowed her to discharge her second court-appointed attorney. 83 P.3d at 633. We found that forcing her to proceed pro se hadn't violated her due process rights in part because, "[g]iven the weight of evidence and the history of the case, there was little that a third court-appointed attorney could have done in this hearing to turn the tide in [her] favor." *Id.* at 637. We also emphasized "the simplicity of [that] hearing," her "failure to cooperate" with her

26

previous attorney, and the fact that she had "beg[u]n the hearing with counsel" but "had no witnesses subpoenaed." *Id.*

¶59 As in *C.S.*, this case's extreme facts demonstrate that a third court-appointed attorney couldn't have turned the tide in father's favor. While represented, father admitted that B.H. was dependent and neglected. The Department presented overwhelming evidence that father hadn't succeeded with *any* element of his treatment plan, that he wasn't fit, and that he wouldn't become fit in a reasonable amount of time. Moreover, father hadn't seen B.H for the nine months before the termination hearing. And, as in *C.S.*, father hadn't cooperated with his previous two lawyers.

¶60 Indeed, these facts approach the hypothetical we imagined last term in which "it is undisputed that . . . the parent had made no effort to comply with his or her treatment plan and had remained homeless, unemployed, and addicted to drugs, with no prospect for any change in his or her condition in the foreseeable future." *A.R.*, ¶ 58, 456 P.3d at 1280 (discussing ineffective assistance of counsel). In such a case, "the application of the law to the undisputed facts would likely require termination of the parent's parental rights, [regardless of] counsel's conduct." *Id.*

¶61 Father doesn't challenge the sufficiency of the state's evidence, nor does he suggest that he could have rebutted any of it had he been represented. Instead, he

says that he would've offered evidence that placement with his mother was a viable and less drastic alternative to termination. By his telling, he would have shown that the Department allowed her to visit B.H., which he says reveals that the Department had exaggerated its concerns about her. Similarly, father indicates that he would have examined his mother about the therapy that she completed at the request of the Department.

¶62 But that evidence wouldn't have altered the district court's less-drastic-alternatives analysis. The court ruled out anything short of termination because B.H. needed stability—especially in light of his developmental disability—and because father was a threat to B.H.'s safety and the safety of potential caregivers. "Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption." *People in Int. of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007).

¶63 And, even if the court had thought that a relative placement might be in B.H.'s best interests, father's new evidence wouldn't have addressed the court's concerns about his mother. Those concerns were her persistent conspiratorial belief that the Department and B.H.'s foster family were trafficking B.H., her downplaying of B.H.'s developmental delays, and her refusal to follow a no-contact order between her and father. "Placement with a grandparent is not a viable alternative to termination if the grandparent lacks appreciation of the

28

parent's problems or of the child's conditions or needs." *People in Int. of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004). Finally, we note that father told the court not to place B.H. with his mother. *See Z.P.*, 167 P.3d at 215 (ratifying the trial court's rejection of a potential less drastic alternative, in part, because the parent had opposed the placement).

¶64 Given the low risk of a wrong result, father has not demonstrated a due process violation because the absence of counsel did not render the proceeding fundamentally unfair.

### 3. The Statutory Right to Counsel

¶65 The constitutional rule that termination hearings must be fundamentally fair often requires the state to appoint counsel for an indigent parent, but "a parent's right to counsel in a termination proceeding is [primarily] a statutory right." *C.S.*, 83 P.3d at 631; *see also Lassiter*, 452 U.S. at 33 ("A wise public policy . . . may require that higher standards be adopted than those minimally tolerable under the Constitution.").

¶66 "As an indigent parent, [father] had a statutory right to court-appointed counsel at every stage of the dependency and neglect proceeding." *People in Int. of L.B.*, 254 P.3d 1203, 1206 (Colo. App. 2011); *see also* § 19-3-202(1), C.R.S. (2020) (providing a "right to seek the appointment of counsel through the office of

29

respondent parents' counsel . . . if the respondent is unable to financially secure counsel on his or her own"); § 19-1-105, C.R.S. (2020); § 19-3-602(2).

¶67 But that right is waivable, and "waiver may take the form of an express statement . . . , or under certain circumstances, a waiver can be implied." *People v. Arguello*, 772 P.2d 87, 93 (Colo. 1989). Implied waiver requires a person to "engage[] in conduct which manifests an intent to relinquish the right" or to "act[] inconsistently with its assertion." *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984).

¶68 Express or implied, the waiver of a *constitutional* right to counsel must be "voluntary" as well as "knowing and intelligent." *Arguello*, 772 P.2d at 94–95. Voluntary means "the product of a free and deliberate choice rather than intimidation, coercion, or deception," *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)), given "the totality of the circumstances," *People v. Davis*, 2015 CO 36M, ¶ 18, 352 P.3d 950, 955 (quoting *People v. Raffaelli*, 647 P.2d 230, 235 (Colo. 1982)). And "[a] waiver cannot be knowing and intelligent unless the record clearly shows that the defendant understands . . . 'all . . . facts essential to a broad understanding of the whole matter,'" such as "the nature of the charges" and "possible defenses to the charges and circumstances in mitigation thereof." *Arguello*, 772 P.2d at 94 (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)).

30

¶69   In contrast, the "[w]aiver of *statutory* rights"—like an indigent parent's right to counsel in a termination proceeding—"must be voluntary, but need not be knowing and intelligent." *Finney v. People*, 2014 CO 38, ¶ 16, 325 P.3d 1044, 1050 (emphasis added); *accord People v. Newton*, 764 P.2d 1182, 1187 (Colo. 1988) ("[A] waiver of [statutory] rights . . . must be voluntary, but . . . need not comport with the high standard of waiver applicable to basic constitutional rights . . . ."). So, the waiver of a statutory right is effective if it is the product of a free choice, regardless of whether the holder has the "information legally relevant to the making of an informed decision" and is "fully aware of what he is doing." *See People v. Walker*, 2014 CO 6, ¶ 16, 318 P.3d 479, 484 (quoting *People v. Mozee*, 723 P.2d 117, 121 n.4 (Colo. 1986)).

¶70   Thus, a person impliedly waives a statutory right through freely chosen conduct that clearly manifests an intent to relinquish the right or is inconsistent with its assertion.

¶71   In *Arguello*, we concluded that the defendant's

> obstreperous and dilatory conduct . . . taken as a whole—his repeated requests for change of attorneys without good cause, his non-cooperation with his attorneys, his dilatory tactics, and the prolonged verbal abuse he directed at the judge when he was denied a change of counsel—could amount to a "voluntary" waiver of his right to counsel.

31

772 P.2d at 96. Yet we held that there wasn't an implied waiver because the relevant right was constitutional and the record didn't show that the defendant's voluntary waiver by conduct had also been knowing and intelligent. *Id.*

¶72 Here, however, such conduct would suffice because the waiver only needed to be voluntary.

¶73 The district court ruled that father had "lost his ability to have counsel due to his own actions." The court found that father had threatened to kill his first court-appointed attorney and was arrested the next day with a gun, ammunition, and body armor. The court also found that this was an attempt "to play the system." Regarding the second attorney, the court found that father had again "create[d] [his] own conflict of interest" as "an attempt to delay the proceedings." None of these findings are clearly erroneous.

¶74 Applying the legal standard for an implied waiver to our facts, we agree with the district court that father's conduct, viewed as a whole, amounted to a voluntary waiver of his right to appointed counsel. Threatening to kill one court-appointed lawyer and then failing to cooperate with the replacement is clearly inconsistent with asserting the right to appointed counsel. The district court's inference that the purpose was delay is amply supported by the record.

¶75 Thus, father had neither a constitutional nor a statutory right to counsel when the district court declined to appoint a third attorney.

32

## C. Reasonable Efforts and Less Drastic Alternatives to Termination

¶76 Lastly, father argues that the district court shouldn't have found that the Department made reasonable efforts to reunite his family because the Department allegedly failed to mail out family finding letters and didn't explore a reasonable number of placement options as less drastic alternatives to the termination of his parental rights.

¶77 The People and the GAL counter that the record supports the district court's finding that the Department made reasonable efforts to provide services to father. Further, they argue that the district court was right to find that no less drastic alternative would have served B.H.'s best interests.

¶78 Father relies on the phrase "reasonable efforts" in section 19-3-604(2)(h), but that section doesn't articulate a standard for the Department's search for placement options. Rather, it provides that a court evaluating parental fitness should consider whether "[r]easonable efforts by child-caring agencies . . . have been unable to rehabilitate the parent." *Id.* Section 19-3-604(2)(h)'s focus on rehabilitative services is confirmed by the definition of "reasonable efforts," which provides in part that "[s]ervices provided by a county [to prevent unnecessary placement of a child outside of a child's home or to foster the safe reunification of a child with a child's family] . . . in accordance with section 19-3-208 are deemed to meet the reasonable effort standard." § 19-1-103(89), C.R.S. (2020). "Among

other things, the Department must offer screening, assessments, and individual case plans; information and referrals to available public and private assistance resources; and visitation services." *S.K.*, ¶ 16, 440 P.3d at 1247.

¶79 So, section 19-3-604(2)(h) doesn't ask the trial court to assess whether the Department mailed family finding letters or explored enough placement options; those aren't services aimed at rehabilitating father. *See* § 19-3-208(2), C.R.S. (2020). However, father's argument does make more sense as a challenge to the trial court's finding that there weren't less drastic alternatives to termination. *See D.B-J.*, 89 P.3d at 532 (describing the question of whether the agency "evaluate[d] a reasonable number of persons suggested to it as possible placements" as part of the trial court's obligation to "consider remedies less drastic than termination"). Rather than reject father's argument outright, we construe it as such.

### 1. Standard of Review

¶80 When a "trial court consider[s] the availability of an [allocation of parental responsibilities], and still determine[s] that termination of parental rights would be in the child's best interests," we are "bound to affirm the decision of the trial court" if its "findings are supported by the record." *A.M.*, ¶ 49, 480 P.3d at 691.

### 2. Discussion

¶81 "In determining whether permanent placement with a relative or other person is a viable less drastic alternative to termination, the court may consider . . .

whether an ongoing relationship [with the parent] would be . . . detrimental to the child." *People in Int. of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). "Permanent placement is not a viable less drastic alternative to termination if the children need a stable, permanent home that can only be assured by adoption." *Id.*

¶82 As already discussed, the district court categorically rejected all alternatives short of termination as not in B.H.'s best interests because B.H. needs permanency and because father is a threat to the safety of B.H. and potential caregivers. The court also found that the Department had sent family finding letters, apparently crediting a caseworker's testimony that she thought they'd been sent notwithstanding the fact that she didn't have a record of it. Finally, the record shows that the Department explored father's mother, mother's parents, mother's cousin, and the Indiana foster family. Thus, the district court's finding of no less drastic alternatives is supported by the record.

### III. Conclusion

¶83 Because we conclude that the district court may have lacked jurisdiction, we remand this case to the district court for jurisdictional factfinding. If the district court acquires jurisdiction, it may reinstate the termination judgment based on the existing record. The district court may, but need not, appoint counsel for father.