24CA1865 Peo in Interest of SM 04-17-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1865
Jefferson County District Court No. 23JV30033
Honorable Lindsay Van Gilder, Judge

The People of the State of Colorado,

Appellee,

In the Interest of S.M., a Child,

and Concerning J.H.,

Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE YUN
J. Jones and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 17, 2025

Kimberly Sorrells, County Attorney, Claire M. Czajkowski, Assistant County Attorney, Golden, Colorado, for Appellee

Eric Truhe, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     J.H. (mother) appeals the juvenile court's judgment terminating her parent-child legal relationship with S.M. (child). We affirm the judgment.

## I.     Background

¶ 2     The Jefferson County Division of Children, Youth and Families (Division) filed a petition in dependency and neglect due to concerns about mother's substance use and mental health, as well as violence in the home between mother and maternal grandmother.

¶ 3     The juvenile court adjudicated the child dependent or neglected. The court adopted a treatment plan designed to address mother's substance use and mental health issues.

¶ 4     Eight months later, the Division moved to terminate mother's parental rights. But after a contested hearing, the juvenile court denied the motion, finding that mother could become fit with additional time because she had entered inpatient substance abuse treatment for the second time and had plans to discharge to sober living.

¶ 5     Two months later, after mother failed to enter sober living, relapsed, and stopped visiting the child, the Division again moved to terminate mother's parental rights. Following a hearing held over

1

two days nearly a month apart, the court granted the second motion and terminated mother's parental rights.

## II.  General Law and Standard of Review

¶ 6    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the conduct or condition of the parent is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 7    Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law fact because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support."  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  We review de novo the juvenile court's legal conclusions.  *See id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 8    It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## III.    Additional Time

¶ 9    Mother contends that the juvenile court erroneously concluded that she could not become fit within a reasonable time. We are not persuaded.

## A.    Applicable Law

¶ 10    "Once a treatment plan has been devised for a parent, a court may only terminate parental rights when, among other things, the court finds that parent unfit and unable to become fit in a reasonable time." *People in Interest of L.M.*, 2018 COA 57M, ¶ 27. An unfit parent is one whose conduct or condition renders the parent "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." § 19-3-604(2).

¶ 11    When determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider

3

whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 12    What constitutes a reasonable time is fact-specific and must be determined by considering the child's physical, mental, and emotional conditions and needs. *Id.* at ¶ 25. A "reasonable time" is not an indefinite time. *Id.*

## B.    Analysis

¶ 13    The juvenile court concluded that mother was unfit and unlikely to change within a reasonable time because, over the eighteen months the case had been pending, she continued to exhibit the same problems addressed in the treatment plan without making adequate progress. Specifically, the court found that mother never engaged consistently in mental health therapy, nor did she develop any tools to manage her emotional dysregulation and escalation. The court also found that while mother attended inpatient substance use treatment on three occasions, she failed to participate in the required aftercare, leading to relapses and ongoing use. The record supports the court's findings.

¶ 14 The Division initiated this case due to concerns about mother's mental health. According to the caseworker, mother experienced a mental health crisis in front of the child, during which mother became dysregulated, was verbally abusive, and physically lashed out at maternal grandmother. As a result, mother was charged with child abuse, and the Division opened this case. The criminal court stayed mother's criminal cases due to competency concerns and ordered outpatient restoration. To address her mental health concerns, mother's treatment plan required her to engage in individual therapy, follow the treatment recommendations, and manage her medication.

¶ 15 Mother did not adequately address her mental health issues. The caseworker testified that although mother took her medications, she never engaged in individual therapy or learned to de-escalate and self-regulate.

¶ 16 The caseworker also testified about a pattern of disruptive behavior that never improved throughout the case. For example, during mother's last visit with the child, four months before the termination hearing, mother's behavior escalated and "really frightened" the child, who ran to the caseworker "and said mommy

scares me." Two months later, while visiting the caseworker, mother became "enraged" and yelled expletives at the caseworker. The caseworker opined that mother's behavior prevented her from providing appropriate care for the child and that mother exhibited the same mental health concerns as when the case was opened.

¶ 17    The record also shows that mother did not demonstrate an ability to maintain sobriety. Her treatment plan required her to abstain from drugs, complete a substance abuse assessment and follow any recommendations, and undergo two random urine screens per week. The caseworker testified that mother "emphatically indicated that she was not going to be doing the UAs, so she didn't," and that she completed only three urine screens outside of an inpatient setting. Mother testified that she used drugs early in the case "just because I wanted to" and admitted to daily use during the three months before her last inpatient stay. And she admitted to relapsing between the first and second day of the second termination hearing.

¶ 18    True, mother participated in inpatient treatment on three separate occasions, but she did not follow recommendations to discharge to sober living and could not maintain sobriety outside of

a structured setting. The caseworker testified that mother relapsed after every successful discharge. At the conclusion of the second termination hearing, mother had finally entered sober living but had already relapsed on methamphetamine while there.

¶ 19 Based on the evidence in the record, we conclude that the juvenile court did not err by concluding that mother could not become fit within a reasonable time.

## IV. Less Drastic Alternatives

¶ 20 Mother next contends that the juvenile court erred in concluding that no less drastic alternatives, such as an allocation of parental responsibilities (APR) to the paternal aunt and uncle, existed. We disagree.

## A. Applicable Law

¶ 21 In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. In doing so, the court may consider, among other things, whether (1) an ongoing relationship between the parent and child would be beneficial, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; (2) an APR provides adequate permanence and stability

for the child, *People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo App. 2005); and (3) the placement provider prefers adoption over an APR, *People in Interest of S.N-V.*, 300 P.3d 911, 920 (Colo. App. 2011).

¶ 22    For a less drastic alternative to be viable, it must do more than adequately meet the child's needs; it must be in the child's best interests. *A.M.*, ¶ 27. Long-term or permanent placement with a family member may not be in the child's best interests if it does not provide the permanence that adoption would provide or otherwise meet the child's needs. *A.R.*, ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination. *A.M.*, ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 23    In addition, when a child is under six years old at the time of the filing of the petition, as in this case, the case is subject to the expedited permanency planning provisions, and the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

## B. Analysis

¶ 24    The juvenile court considered mother's argument that an APR could be a less drastic form of permanency but concluded that it was not the form of permanency that would serve the child's best interests. The court found that, given the child's "physical, mental, and emotional needs, . . . the best option for her is to receive the permanency and stability . . . that she is receiving in the paternal aunt and uncle's home," which could only be achieved "through an adoption to her current placement." The court also found that there was too much uncertainty about mother's future and that "an APR is simply not permanent . . . and can really result in future litigation." The record supports the court's findings.

¶ 25    The caseworker testified that the paternal aunt and uncle, with whom the child was placed, preferred adoption to an APR. The child thrived in the placement, and the paternal aunt and uncle accommodated her physical, mental, and emotional conditions and needs. The caseworker testified that mother had no contact with aunt or uncle regarding the child's speech and mental health needs. The caseworker opined that adoption would be in the child's best interests because this placement was the only family the child had

9

known, the child felt safe with them, they understood how to address the child's needs, and removing the child from their care would be traumatic for her.

¶ 26    In addition to the uncertainty created by mother's unresolved substance abuse and mental health concerns discussed above, mother did not consistently participate in family time, preventing her from establishing a relationship with the child. The family time facilitator testified that mother's family time with the child became increasingly inconsistent as the case progressed. Mother would attend family time for three to four weeks but then miss all visits for the next three to four weeks. Visitation services were closed at least twice in a thirteen month span due to mother's lack of participation. The facilitator testified that after family time was missed, mother's and the child's "connection would be broken[,] and they would have to spend more time getting reacquainted with each other."

¶ 27    As mentioned above, mother's last visit with the child occurred four months before the termination hearing. The caseworker testified that even before this last visit, the child would become upset and "cry inconsolably" after visits, and visits were "very hard"

10

on the child. Given this negative impact on the child, mother agreed to participate in a therapeutic assessment before resuming family time. But mother did not follow through with scheduling that assessment and family time never resumed. At the second termination hearing, the caseworker opined that mother did not know the child or have a relationship with the child.

¶ 28 Because the record supports the juvenile court's determination that there was no less drastic alternative and that termination was in the child's best interests, we will not disturb its decision. *See B.H.*, ¶ 81; *A.M.*, ¶¶ 32, 49.

## V. Disposition

¶ 29 We affirm the judgment.

JUDGE J. JONES and JUDGE BROWN concur.