25CA1084 Peo in Interest of ZD 11-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1084
El Paso County District Court No. 23JV30933
Honorable Robin Chittum, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Z'L.D., C.S., and D.S., Children,

and Concerning C.S.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Welling and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 13, 2025

---

Kenny Hodges, County Attorney, Melanie Gavisk, Assistant County Attorney, Charlotte Mary Burton, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1   In this dependency and neglect proceeding, C.S. (father) appeals the judgment terminating his parent-child legal relationships with Z'L.D., C.S., and D.S. (the children). We affirm.

## I.   Background

¶ 2   In November 2023, the El Paso County Department of Human Services filed a petition in dependency and neglect concerning the then-nine-month-old, two-year-old, and three-year-old children. The Department alleged concerns about the parents' substance use, domestic violence, and involvement with the criminal justice system. The Department also expressed concerns that father had left the children with various friends who hadn't provided the children with proper care.

¶ 3   The juvenile court granted temporary legal custody of the children to the Department, and the children were placed in foster care. Despite efforts to locate and personally serve father, the Department was unable to do so. As a result, the Department served father by publication. The court later adjudicated the children dependent or neglected by default, finding that father had abandoned the children. The court also found that no appropriate treatment plan could be devised for father.

¶ 4    Several months later, father appeared in court and requested that the juvenile court order the Department to create a treatment plan for him.  The juvenile court granted the request and later adopted a treatment plan that required father to maintain contact with the caseworker, develop and demonstrate parental protective capacity, address domestic violence concerns, and address his substance use issues.

¶ 5    The Department later moved to terminate father's parental rights.  Father didn't appear at the termination hearing, and the caseworker testified that father hadn't complied with any part of his treatment plan and that his whereabouts were unknown to the Department.  After considering the evidence, the juvenile court granted the Department's termination motion.

## II.    Less Drastic Alternatives

¶ 6    Father sole contention on appeal is that the juvenile court erred by finding that there were no less drastic alternatives to termination.  Specifically, he argues that the Department failed to investigate the children's paternal relatives as potential placement options who might have been willing to accept an allocation of parental responsibilities (APR).  We discern no error.

### A. Applicable Law and Standard of Review

¶ 7    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.  Consideration and elimination of less drastic alternatives is implicit in the statutory criteria for termination.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40.

¶ 8    In analyzing less drastic alternatives, the juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29.  A juvenile court may also consider, among other things, (1) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009), and (2) whether an APR would provide adequate permanence and stability for the child, *see People in Interest of T.E.M.,* 124 P.3d 905, 910 (Colo. App. 2005).

¶ 9     For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. Long-term or permanent placement with a family member, short of termination, may not be in a child's best interests if it doesn't provide the permanence assured by adoption or otherwise meet that child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 41.

¶ 10     To aid the court in determining whether a less drastic alternative to termination exists, the department must evaluate a reasonable number of persons the parent identifies as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department isn't obligated to "independently identify and evaluate other possible placement alternatives." *People in Interest of Z.P.*, 167 P.3d 211, 215 (Colo. App. 2007).

¶ 11     "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34. Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in a child's best interests, we are bound to affirm the court's decision so long as the

record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

B.    Analysis

¶ 12    To start, we reject father's argument that the juvenile court erred by finding that the Department sufficiently investigated his relatives as potential placement options for the children who may have been willing to accept an APR. The juvenile court found, with record support, that the Department made efforts to investigate both maternal and paternal family members as potential placement options but that none of those family members "stepped forward [to] indicate . . . [that] they [could] take these children."

¶ 13    Specifically, the caseworker testified that she investigated every family member suggested by the children's mother. Although one out-of-state relative that mother suggested was approved as a placement option, that relative told the caseworker that she was unable to care for the children. Moreover, the caseworker testified that all of the other relatives suggested by mother either didn't respond when the caseworker reached out to them or didn't pass the background check that is required to be considered as a placement option.

5

¶ 14    As to father's relatives, the caseworker testified that the Department typically relies on "communications from the parents" to help identify potential kin placement options. Although the caseworker testified that father had mentioned that he had relatives in Kentucky, nothing in the record shows that father ever provided specific names or any contact information for those relatives. Even so, the caseworker testified that when a parent doesn't provide information about their relatives, the Department can run a family search and engagement study, which utilizes the parent's contact information to identify their relatives. The caseworker said that the Department conducted two of those studies, which revealed eight relatives as potential placement options. The Department sent letters to those relatives on two different occasions, but none of them responded. Based on that information, the caseworker concluded that, at the time of the termination hearing, no "family members or kin-like individuals" were available as a placement option for the children.

¶ 15    Accordingly, we disagree with father's assertion that the juvenile court erred by finding that the Department had adequately investigated his relatives, especially considering that no evidence

indicates that father provided any specific information about his relatives at any time during the proceedings. *See Z.P.*, 167 P.3d at 215 (a department isn't obligated to independently identify possible placement alternatives); *see also D.B-J.*, 89 P.3d at 532 (rejecting a less drastic alternative argument because the parent didn't identify the relatives to the department or the court before the termination hearing).

¶ 16 In any event, even assuming, as father asserts, that one of his relatives would have been deemed appropriate and willing to accept an APR, we still discern no error. To an extent, father's argument conflates placement options with less drastic alternatives. *See A.R.*, ¶ 44 (While placement preferences are relevant when determining which among a choice of placements is in the child's best interest, "a less drastic alternative analysis considers whether *any* placement, short of termination, would be in the child's best interest."). And here, the juvenile court categorically rejected any APR, finding that termination and eventual adoption were in the children's best interests.

¶ 17 Specifically, the court found that the children "don't know" father and, thus, "there is not really a loss there in that

relationship." Further, although the court acknowledged that termination could potentially result in the loss of the children's relationships with their extended family or their culture, it found that the benefits of adoption "greatly outweighed" those potential losses. To that end, it found that termination and adoption would provide the level of stability and permanency the children needed, particularly because they needed to know who would care for them and where they would be "for the rest of their lives." Additionally, the court found that an APR would create the "potential of trauma down the line" because the parents might "show back up," and that wasn't in the children's best interests. In sum, the court determined that any APR, regardless of the placement option, wasn't a viable less drastic alternative to termination.

¶ 18    The record supports the juvenile court's findings. First, the caseworker testified that father hadn't attended family time at any point during the proceedings; father had last seen the children a year-and-a-half before the termination hearing. The caseworker also testified that she had met with the children at least once a month, and the children never asked about father.

¶ 19    Second, the caseworker, who testified as an expert in child protection and child welfare, opined that termination and eventual adoption would provide the permanency that the children needed. She opined that the children needed to know that they wouldn't "be moving around from home to home" and that they would be in a "safe and stable environment." Because father hadn't engaged or complied with any part of his treatment plan, the caseworker didn't believe that father could provide a safe and stable environment for the children. Thus, she opined that termination and eventual adoption were in the children's best interests.

¶ 20    Given all this, we conclude that the juvenile court properly considered and rejected an APR based on the lack of a bond between father and children, *see N.D.V.*, 224 P.3d at 421, and the children's need for permanency and stability, which wouldn't be provided by an APR, *see T.E.M.*, 124 P.3d at 910. Because the record supports the juvenile court's finding that termination, not an APR, was in the children's best interests, we perceive no basis to reverse. *See B.H.*, ¶ 80.

### III.    Disposition

¶ 21    We affirm the judgment.

JUDGE WELLING and JUDGE BERNARD concur.