23CA2126 Peo in Interest of BH 08-29-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA2126 El Paso County District Court No. 22JV30200 Honorable Robin Chittum, Judge The People of the State of Colorado, Appellee, In the Interest of B.H. and R.H., Children, and Concerning T.H. and T.L.L., Appellants. JUDGMENT AFFIRMED Division I Opinion by JUDGE WELLING J. Jones and Schock, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 29, 2024 Kenneth R. Hodges, County Attorney, Shannon Boydstun, Assistant County Attorney, Colorado Springs, Colorado, for Appellee Josi McCauley, Guardian Ad Litem Lindsey Parlin, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant T.H. Robin Tieman, Office of Respondent Parents’ Counsel, Boulder, Colorado, for Appellant T.L.L. 
1 ¶ 1 In this dependency and neglect proceeding, T.H. (father) and T.L. (mother) appeal the judgment terminating their parent-child legal relationships with B.H. and R.H. (the children). We affirm. I. Background ¶ 2 The El Paso County Department of Human Services filed a petition in dependency and neglect regarding the then-eleven-
month-old and one-month-old children. The Department alleged concerns about mother’s mental health, father’s aggressive behavior toward one of the children, and both parents’ substance use. The juvenile court granted temporary legal custody to the Department, and the Department placed the children in foster care. ¶ 3 The juvenile court adjudicated the children dependent or neglected. The court adopted substantially similar treatment plans for both parents requiring them to regularly attend family time, address substance abuse issues, develop parental protective capacities, become self-sufficient, participate in life skills training, and engage in mental health treatment. Father’s treatment plan also required him to cooperate and communicate with the Department. And, although mother’s treatment plan didn’t require 
2 her to cooperate with the Department, the court ordered her to do so. ¶ 4 The Department later moved to terminate both parents’ legal relationships with the children. About three months later, following an evidentiary hearing, the juvenile court granted the motion. II. Reasonable Efforts ¶ 5 Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate them and reunite their family. We disagree. A. Applicable Law and Standard of Review ¶ 6 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn’t complied with an appropriate, court-approved treatment plan or the plan hasn’t been successful; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change within a reasonable time. § 19-3-
604(1)(c), C.R.S. 2024. ¶ 7 To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. 
3 See §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024; People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011). “Reasonable efforts” means the “exercise of diligence and care” for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2024. Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard. § 19-1-103(114). ¶ 8 Under section 19-3-208, a department must provide screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b). And if funding is available, section 19-3-208 requires a department to provide services such as transportation, diagnostic and mental health services, and drug and alcohol services. § 19-3-208(2)(d). However, services must be provided only if they are determined to be necessary and appropriate based on the individual case plan. § 19-3-208(2)(b), (d). ¶ 9 In deciding whether a department satisfied its reasonable efforts obligation, the juvenile court should consider whether the provided services were appropriate to support the parent’s 
4 treatment plan. S.N-V., 300 P.3d at 915. However, the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. People in Interest of J.C.R., 259 P.3d 1279, 1285 (Colo. App. 2011). And when a parent voluntarily absents themself from a proceeding, a department need not persist with futile efforts. See People in Interest of A.V., 2012 COA 210, ¶ 12. Moreover, a juvenile court may consider a parent’s unwillingness to participate in treatment as a factor in determining whether a department made reasonable efforts. See id. ¶ 10 Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law. People in Interest of A.S.L., 2022 COA 146, ¶ 8. Therefore, we review the juvenile court’s factual findings for clear error but review de novo the court’s legal determination as to whether the department satisfied its reasonable efforts obligation. Id. B. Analysis ¶ 11 The parents argue that the caseworker never referred them to mental health or substance abuse treatment and that the Department didn’t provide transportation to family time or 
5 treatment. Additionally, father argues that the Department failed to provide him with a phone or set up virtual visits when he requested them. We discern no basis for reversal. ¶ 12 In its ruling, the juvenile court said that it had heard “quite a bit about reasonable efforts” and considered that testimony “critically.” The court found that the Department made reasonable efforts because it had done what it could to help the parents “have access to resources, to succeed to get through the treatment plan, [and] to try to support and engage [them].” The court noted that the caseworker had tried to coordinate with the other caseworker assigned to mother’s open case in Pueblo to “make sure that things were provided to th[e] family.” The court found that the caseworker regularly emailed the parents “to get them involved” and to “let them know about staffings and services.” The court also found that the Department provided a phone to the parents, referred them to life skills training, provided them information about veteran’s housing, offered them substance abuse and mental health treatment, organized their transportation to life skills training and treatment, and set up family time by making several referrals to different visitation providers. 
6 ¶ 13 The record supports these findings. ¶ 14 In general, the record shows that the Department worked with the parents’ teams and the caseworker assigned to mother’s Pueblo case to coordinate services, but the parents didn’t engage. In particular, the caseworker testified that the Department had biweekly meetings at which the team, including the Pueblo caseworker, would discuss the parents’ treatment plans and determine which services needed to be set up. The caseworker testified that she regularly and repeatedly sent email reminders about the meetings to the email addresses provided by the parents, but they didn’t attend those meetings. And the caseworker said that during those meetings, she asked the professionals on the parents’ teams what else she could do to support the parents, and then she followed up on everything the parents’ teams asked her to do. ¶ 15 It’s true, as the parents point out, that the caseworker didn’t make referrals to mental health or substance abuse treatment for either parent except for one referral for mother at the beginning of the case. The caseworker testified that at the beginning of the case, she made a referral for mother to get a mental health evaluation at 
7 Bright Space Counseling. But after that was closed due to Medicaid issues, the caseworker, along with mother’s team, determined that the best place for mother to receive treatment would be at a facility called Crossroads, which provided both substance abuse and mental health services. The caseworker contacted Crossroads and gave mother all the information she needed to begin treatment there. As to father, the caseworker testified that after he told her he wanted to attend treatment at Health Solutions, she called the provider to determine what would be necessary for him to do so and then emailed that information to him on the same day. ¶ 16 Even though the caseworker didn’t make any additional referrals for mental health or substance abuse treatment, she contacted both providers and they told her that referrals were unnecessary because the parents could simply make an appointment or walk in to receive treatment using their Medicaid benefits. And yet, after she provided this information to the parents, they never went to Crossroads or Health Solutions, and instead, started going to a methadone clinic called Behavioral Health Group (BHG). At that point, the caseworker requested that both parents sign releases so that she could speak to the providers 
8 at BHG. Mother never signed a release but father did, and the caseworker was able to confirm that he was regularly receiving methadone and attending individual therapy at BHG. Thus, the caseworker testified, in sum, that because the parents told her that they were receiving treatment at BHG, and because BHG provided both substance abuse and mental health treatment, she determined that additional referrals weren’t necessary. See § 19-3-208(2)(b), (d) (services must only be provided if they are determined to be “necessary and appropriate”); see also A.V., ¶ 12 (noting that a department is not required to make futile efforts). ¶ 17 Next, the record indicates that the Department facilitated transportation for the parents to attend family time and life skills training. Father testified that the Department “put [him] in contact with Medride.” The caseworker testified that by the time the parents needed transportation to family time, Medride was already set up. Notably, the caseworker, along with the parents’ teams, decided that it would be best to refer the parents to life skills training at the same facility as family time so that Medride could provide transportation to both. The caseworker said that the parents agreed to utilize Medride to get to family time. And the 
9 caseworker testified that while the Department was ordered to provide bus tickets to the parents to make sure they could attend family time, the bus “was not an issue” because the parents had transportation through Medride. ¶ 18 We also reject father’s arguments that the Department failed to make reasonable efforts because the caseworker didn’t provide him with a phone or set up virtual visits when he requested them. First, the caseworker testified that when the Department provided a phone to mother, father didn’t need a phone because he already had one. The caseworker also testified that father gave her several different phone numbers throughout the case and never asked her to provide him with a phone. Second, the caseworker testified that when father requested virtual visits, she made a referral to set them up. However, the visitation provider attempted to contact father at least six times, and he didn’t respond, so the provider closed the referral. Thereafter, father asked the caseworker to make another referral, which she did, and then the virtual visits were set up within the same month father requested the second referral. ¶ 19 Lastly, although the juvenile court found that the Department’s efforts were reasonable, it also found that the 
10 Department’s “ability to provide reasonable efforts was tempered by the parents’ willingness to engage” and that when the caseworker “tried to set [services] up,” the parents “would refuse treatment.” The record supports these findings as well. The caseworker testified that mother didn’t regularly communicate with her throughout the case despite the caseworker’s attempts to call, email, and meet with her. The caseworker said that she never had any contact with mother “outside of speaking to [father] as well” and that she had never been able to meet with mother in person. As to father, the caseworker testified that he communicated with her more than mother but that his communication was “sporadic,” and when she would speak with him about setting up services, he would “blame” mother and state that he didn’t need services or want any referrals. The caseworker testified that their conversations never “got past” father objecting to services and directing her to speak with his attorney. And the caseworker testified that she was unable to fully evaluate the parents’ needs because of their lack of communication with her. During a review hearing about three months after the juvenile court adopted the parents’ treatment plans, mother’s counsel said on record that the 
11 caseworker was “doing everything she [could] . . . to look at engagement with the parents” and that the “resources” and “tools” were available, but they were missing the “last piece,” which was action on mother’s part. And father’s counsel said that although father had expressed interest in attending inpatient rehabilitation, the team was waiting on “more contact” from father. ¶ 20 Accordingly, because the juvenile court’s findings are supported by the record, we won’t disturb its determination that the Department satisfied its reasonable efforts obligation. III. Less Drastic Alternatives ¶ 21 Father contends that the juvenile court erred by concluding that there were no less drastic alternatives to termination. He argues that the Department failed to sufficiently investigate whether a family friend, M.C., was an appropriate placement for one of the children. We discern no error. A. Applicable Law and Standard of Review ¶ 22 The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary 
12 consideration to the child’s physical, mental, and emotional conditions and needs. People in Interest of Z.M., 2020 COA 3M, ¶ 29. A juvenile court may also consider other factors, including whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent’s fitness to care for the child’s needs. People in Interest of A.R., 2012 COA 195M, ¶ 38. And a juvenile court may consider whether the placement provider favors adoption over an allocation of parental responsibilities (APR). S.N-V., 300 P.3d at 920. ¶ 23 To aid the court in determining whether there is a less drastic alternative to termination, a department must evaluate a reasonable number of persons the parent identifies as placement options. People in Interest of D.B-J., 89 P.3d 530, 532 (Colo. App. 2004). But a department isn’t obligated to “independently identify and evaluate other possible placement alternatives.” People in Interest of Z.P., 167 P.3d 211, 215 (Colo. App. 2007). ¶ 24 For a less drastic alternative to be viable, it must do more than adequately meet the child’s needs; it must be in the child’s best interests. A.M., ¶ 27. “[L]ong-term or permanent placement with a family member or foster family, short of termination, may not be a 
13 viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child’s needs.” A.R., ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child’s best interests, it must reject the alternative and order termination. A.M., ¶ 32. ¶ 25 “We review a juvenile court’s less drastic alternatives findings for clear error.” People in Interest of E.W., 2022 COA 12, ¶ 34. Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in the child’s best interests, we must affirm the court’s decision if the record supports its findings and legal conclusions. People in Interest of B.H., 2021 CO 39. B. Analysis ¶ 26 The juvenile court considered whether there were any less drastic alternatives to termination that would be in the children’s best interests but ultimately determined there weren’t. The court found that the Department made reasonable efforts to locate kin placements, including M.C. However, the court found that M.C. wasn’t a viable less drastic alternative because M.C. couldn’t take 
14 both children and it “would not be in the best interest[s] of these [children] to split them up.” And the court found that while the Department looked into “a lot of other family members,” including family on both the paternal and maternal sides, none of them were willing and able to take the children. ¶ 27 The juvenile court also found that although the children knew their parents as “fun people that they can talk to on the virtual visits,” these were not “real parental relationship[s] where [the children] would turn to their parents to meet [their] needs.” The court found that the parents weren’t fit and couldn’t take “care of the two little girls.” Relatedly, the court determined that adoption, not an APR, was in the children’s best interests based on “their age and their mental, physical, and emotional needs.” The court found that an APR could “set them up” for “potential trauma” if the case were reopened for modification in the future. Thus, the court found that termination of parental rights was in the children’s best interests. ¶ 28 The record supports these findings. The caseworker testified that when the case was opened, the Department conducted a family search and engagement, but no placement options were discovered 
15 from that search. The caseworker said that she received M.C.’s contact information about two months before the termination hearing. Contrary to father’s argument, the caseworker testified that she called M.C. twice and texted her multiple times before she responded that she could only take one of the children. Thus, the caseworker opined that M.C. wasn’t appropriate as a less drastic alternative because the children have “a significant bond to each other” and splitting them up wouldn’t be in their best interests. The caseworker also testified that she reached out to both of father’s adult children, but one of them had six children of his own, so he couldn’t be a placement option. The other told the caseworker that she would think about whether she could be a placement option but then never followed up. Additionally, the caseworker spoke to the children’s maternal grandmother who said that she was unable to take the children because of her living situation. The caseworker also reached out to another maternal family member and his wife to explore them as a placement option, but they didn’t respond. The caseworker said that she “explored” all names that were given to her and that none of those people had 
16 expressed a desire or willingness to be a placement for both children. ¶ 29 Next, the caseworker testified that the children had specific ongoing mental health and medical needs; specifically, one child needed ongoing speech therapy, and both needed occupational therapy. The caseworker opined that neither parent was capable of meeting the children’s needs because neither parent had demonstrated sobriety and because mother wasn’t mentally stable. The caseworker opined that an APR would put the children’s safety at risk. Further, although the court didn’t make any findings about the foster parents’ preference, the caseworker testified that when she had discussed permanency with them, they said that they wanted to adopt the children. ¶ 30 Lastly, the expedited permanency planning provisions apply when, as here, a child is less than six years old at the time of the filing of the petition in dependency or neglect.  § 19-1-123(1)(a), C.R.S. 2024. Thus, the juvenile court was required to place the children in a permanent home as expeditiously as possible. § 19-3-
702(5)(c), C.R.S. 2024. 
17 ¶ 31 By the time of the termination hearing, the children had been out of the home for approximately fifteen months. The caseworker didn’t specifically refer to the children’s young ages as a reason that termination was in their best interests, but she opined that they needed a stable and permanent home which could only be assured through termination and adoption. Section 19-1-102(1.6), C.R.S. 2024, supports the caseworker’s opinion, as it provides that “children undergo a critical bonding and attachment process prior to the time they reach six years of age” and recognizes that “a child who has not bonded with a primary adult during this critical stage will suffer significant emotional damage which frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood.” § 19-1-102(1.6). ¶ 32 Therefore, because the record supports the juvenile court’s finding that no less drastic alternative to termination was in the children’s best interests, we discern no basis for reversal. IV. Disposition ¶ 33 The judgment is affirmed. JUDGE J. JONES and JUDGE SCHOCK concur.