24CA0687 Peo in Interest of LCC 12-19-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0687
City and County of Denver Juvenile Court No. 21JV425
Honorable J. Robert Lowenbach, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of L.C.C. and I.P.W., Children,

and Concerning S.L.W. and M.R.C.,

Appellants.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE HAWTHORNE*
Román, C.J., and Graham*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 19, 2024

---

Kerry Tipper, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Ainsley Bochniak, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant S.L.W.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant M.R.C.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024

¶ 1    In this dependency and neglect proceeding, M.R.C. (father) and S.L.W. (mother) appeal the judgment terminating father's parent-child legal relationship with L.C.C. and mother's parent-child legal relationships with L.C.C. and I.P.W. (the children).  We affirm.

## I.    Background

¶ 2    In June 2021, the Denver Department of Human Services filed a petition in dependency or neglect concerning then-three-year-old I.P.W. and eight-year-old L.C.C.  At the time, I.P.W. lived with mother, but L.C.C. had been living with paternal grandmother for approximately three months.  The Department noted that father had been previously adjudicated as L.C.C.'s legal father, but the identity of I.P.W.'s father was unknown.  The Department alleged concerns about mother's substance use and criminal activity, as well as I.P.W.'s lack of supervision and exposure to domestic violence.

¶ 3    The juvenile court granted temporary legal custody of the children to the Department.  It placed I.P.W. with maternal uncle, D.W., and L.C.C. remained with paternal grandmother.  The court later adjudicated the children dependent or neglected and adopted treatment plans for both parents.

¶ 4       In July 2022, D.W. went on a trip and left I.P.W. with a family friend without notifying the Department or seeking approval.  The Department removed I.P.W. from D.W.'s care and briefly placed her with maternal uncle, J.R.  J.R. then attempted to manipulate a urinalysis (UA) test's results by bringing synthetic urine to his UA appointment.  The Department removed I.P.W. from J.R.'s care and placed her with L.C.C.'s paternal grandmother.  About two months later, after paternal grandmother reported that she could not be a long-term placement, the Department placed I.P.W. in foster care. L.C.C. remained with paternal grandmother.

¶ 5       The Department then moved to terminate the parents' legal relationships with the children.  D.W., J.R., and maternal grandmother intervened in the case and asked that I.P.W. be placed with one of them.  The juvenile court held a six-day termination hearing and denied the Department's termination motion, finding that while it could eliminate placing I.P.W. with J.R. as a less drastic alternative, it could not eliminate placing her with D.W.  The court ordered the Department to create a treatment plan for D.W. and a transition plan for I.P.W. to return to D.W.'s care.

¶ 6    Several months later, the Department filed another motion to terminate the parents' legal relationships with the children. After a four-day termination hearing, the juvenile court granted the Department's motion.

## II.    Less Drastic Alternatives

¶ 7    Both parents contend that the juvenile court erred by finding that termination was in L.C.C.'s best interests when an allocation of parental responsibilities (APR) to paternal grandmother was an available less drastic alternative. We discern no error.

### A.    Applicable Law and Standard of Review

¶ 8    Consideration and elimination of less drastic alternatives is implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. A juvenile court may also consider other factors, including whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent's fitness to care for the child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. And a juvenile court may

consider whether the placement provider favors adoption over an APR. *Z.M.,* ¶ 31.

¶ 9 For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.,* ¶ 27. Long-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs. *A.R.,* ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *A.M.,* ¶ 32.

¶ 10 "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.,* 2022 COA 12, ¶ 34. So, when a juvenile court considers a less drastic alternative but instead finds that termination is in the child's best interests, we are bound to affirm the court's decision if the record supports its findings. *People in Interest of B.H.,* 2021 CO 39, ¶ 80.

¶ 11    The juvenile court considered whether an APR to paternal grandmother was in L.C.C.'s best interests but ultimately concluded it was not.  Specifically, the court found that both paternal grandmother and L.C.C. preferred termination and eventual adoption.  The court also found that it would not be in L.C.C.'s best interests to "require him to settle for the less permanent and less stable legal option of allocation of parental rights and responsibilities to his grandmother" and that an APR would "deprive [L.C.C.] of the stability, care and permanency that only adoption can provide."

¶ 12    The record supports these findings.  The caseworker testified that paternal grandmother wanted to adopt L.C.C. and was not open to an APR.  The caseworker also testified that while L.C.C. wanted to continue to have some contact with his parents, he wanted paternal grandmother to adopt him.  And the caseworker opined that an APR would not give L.C.C. the sense of permanency he needed.

¶ 13    We reject mother's argument that the juvenile court erred by declining to enter an APR because paternal grandmother did not

understand all of her legal options. To the contrary, the caseworker testified that she, the guardian ad litem (GAL), and mother's counsel had conversations with paternal grandmother about alternatives to termination, including APR and the relative guardianship assistance program. But throughout those conversations, paternal grandmother maintained that she preferred adoption over other alternatives.

¶ 14 We are also unpersuaded by mother's argument that the juvenile court erred by declining to enter an APR because paternal grandmother would not have relinquished custody of L.C.C. if an APR had been entered. This fact did not, on its own, render an APR a viable less drastic alternative. Rather, in determining whether an APR was viable, the court properly considered other factors, such as L.C.C.'s need for stability and permanency, in conjunction with paternal grandmother's preference for adoption. *See Z.M.*, ¶ 29 (in considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs).

¶ 15 We also reject father's argument that the juvenile court infringed on his fundamental constitutional right to parent L.L.C.

by declining to enter an APR to paternal grandmother. The Department and the GAL assert that father did not preserve this argument for appeal because he failed to raise it prior to or during the termination hearing. Even assuming, without deciding, that the argument was preserved, we are not persuaded.

¶ 16    Relying on *A.M.*, father argues that a less drastic alternative does not have to be the "best" option for a child. And he asserts that his fundamental right to parent was violated because L.C.C.'s needs would have been adequately met by an APR to paternal grandmother. But father's reliance on *A.M.* is misplaced because in that case, the supreme court considered and rejected the exact argument father makes here. *See A.M.*, ¶¶ 33-38. Specifically, the supreme court rejected an "adequacy" standard for determining whether a less drastic alternative is viable, stating that "[p]rimary consideration of the child's physical, mental, and emotional condition and needs requires more than a mere assessment of adequacy in order to satisfy the overall intent of the Children's Code." *Id.* at ¶ 31. The supreme court concluded that "the consideration and elimination of a less drastic alternative to termination on the ground that termination best serves the child's

interests, where the statutory criteria for termination are otherwise established by clear and convincing evidence, satisfies due process." *Id.* at ¶ 37. Father does not challenge the court's findings regarding the termination factors set forth in section 19-3-604(1)(c), C.R.S. 2024. And, as noted above, sufficient evidence supports the court's finding that termination, not an APR, was in L.C.C.'s best interests.

¶ 17 So, we conclude that the juvenile court did not err by finding that termination, rather than an APR, was in L.C.C.'s best interests. *B.H.*, ¶ 80.

### III. Ineffective Assistance of Counsel

¶ 18 Mother also contends that she received ineffective assistance of counsel. She asserts that at the termination hearing, her trial counsel failed to cross-examine the forensic toxicologist, Dr. Brown, and failed to call a different forensic toxicologist, Dr. Abbas, as a witness. She also asserts that her appellate counsel failed to secure affidavits from Dr. Brown and Dr. Abbas to show what their testimony would have been at the termination hearing. Mother argues that the toxicologists' testimony would have demonstrated J.R.'s credibility and sobriety. And that, in turn, would have persuaded the court to find that the less drastic APR to J.R.

alternative was available and in I.P.W.'s best interests. We are not persuaded.

## A. Applicable Law

¶ 19      A parent has a statutory right to effective counsel in dependency and neglect proceedings. §§ 19-1-105(2), 19-3-202(1), C.R.S. 2024; *A.R. v. D.R.*, 2020 CO 10, ¶ 47. A party can raise a claim of ineffective assistance of counsel in a dependency and neglect proceeding for the first time on appeal. *People in Interest of C.H.*, 166 P.3d 288, 291 (Colo. App. 2007).

¶ 20      To establish a claim of ineffective assistance of counsel in a termination of parental rights proceeding, a parent must show that (1) counsel's performance was deficient because it fell outside the wide range of professionally competent assistance, and (2) there is a reasonable probability that but for counsel's unprofessional errors, the proceeding's result would have been different. *A.R.*, ¶¶ 48-51, 60; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). "If the parent fails to establish either prong of this test, the claim fails." *People in Interest of C.B.*, 2019 COA 168, ¶ 26.

¶ 21      Under this approach, we must remand for an evidentiary hearing if the parent's allegations are sufficiently specific and

9

compelling to constitute a prima facie showing of ineffective assistance of counsel. *A.R.,* ¶ 63. But, if the parent's allegations lack sufficient specificity, we may summarily deny the ineffective assistance claim. *Id.*

## B. Analysis

¶ 22 First, we reject mother's argument that trial counsel's failure to cross-examine Dr. Brown constituted ineffective assistance. Mother asserts that her counsel should have elicited testimony from Dr. Brown that environmental exposure to cocaine could have caused J.R.'s positive oral swab test results. However, while Dr. Brown opined that J.R.'s oral swab test results indicated cocaine ingestion, he also testified that environmental exposure could cause positive results "[i]f the exposure is severe enough and the drugs - - it is done in a way in which the drugs actually [are] ingested and entered the body." Thus, because the court heard the evidence mother now asserts her counsel should have elicited, we conclude that mother has not established that counsel's failure to cross-examine Dr. Brown prejudiced her.

¶ 23 Next, we reject mother's argument that trial counsel's failure to call Dr. Abbas as a witness amounted to ineffective assistance.

10

Mother asserts that Dr. Abbas would have opined that environmental exposure to cocaine caused J.R.'s positive hair test results, which would have proved that J.R. had been honest when he denied using cocaine even after his positive hair test results. But, even assuming, without deciding, that Dr. Abbas's testimony would have convinced the juvenile court that J.R. had been honest about his hair test results, mother has not established a reasonable probability that the proceeding's result would have been different.

¶ 24 We recognize that the juvenile court found J.R.'s testimony to be incredible based, at least in part, on his denial of cocaine use despite his positive hair test results. But the court also based its credibility finding on the undisputed fact that J.R. attempted to falsify a UA result during the pendency of the case. And mother does not explain how evidence showing that J.R. was honest about his hair test results would have refuted that he had separately attempted to falsify a UA result.

¶ 25 We also recognize that Dr. Abbas had testified in a previous hearing that J.R.'s hair test results indicated environmental exposure to cocaine because norcocaine was not present. But at the same hearing, Dr. Abbas admitted that because of the amount

of norcocaine necessary to show as positive, it was possible to ingest cocaine and still produce a negative norcocaine hair test result. Dr. Abbas also testified that he was "not very familiar with" oral fluid testing and that "every kind of test stands on [its] own." So, even if Dr. Abbas had opined at the termination hearing that J.R.'s hair test results indicated environmental exposure to cocaine, mother does not explain how his testimony would have refuted Dr. Brown's opinion that J.R.'s oral swab results indicated ingestion.

¶ 26    Also, the juvenile court did not determine that termination, not an APR, was in I.P.W.'s best interests based solely on J.R.'s alleged lack of credibility or sobriety. Rather, the court found, with record support, that I.P.W. was "fragile" and had problems with social interactions, dysregulation, hypervigilance, aggression, and post-traumatic stress disorder. And the court concluded that I.P.W. had "significant special needs that would be difficult for [J.R.] and his family to meet." It also found, with record support, that I.P.W.'s behavioral and mental health issues were based, at least in part, on "the number of moves she [had] experienced in her life" and that I.P.W. was "concerned about moving again." So, the court concluded that I.P.W. would be "harmed" by "any move" and that

12

placement with "any of the kinship options" through an APR would deprive her of the stability, care, and permanency she needed.

¶ 27     The record also supports the court's rejecting an APR to J.R. for other reasons.  The caseworker testified that she would be concerned about placing I.P.W. with J.R. because "even if he [was] sober," he still lived with D.W., and the caseworker believed D.W. was actively using substances.  The caseworker was also concerned because even though J.R. knew that D.W. and maternal grandmother struggled with substance use, J.R. identified them as his support system for helping with his children.  And J.R. testified that although he had concerns about D.W.'s and maternal grandmother's substance use, he still allowed them to watch his children and would rely on them to help if I.P.W. was placed with him.

¶ 28     Based on the foregoing, mother's claim that Dr. Abbas's testimony would have persuaded the court to grant an APR to J.R instead of terminating mother's parental rights is too speculative to establish prejudice.  *See People v. Sherman*, 172 P.3d 911, 914 (Colo. App. 2006) (holding that a speculative claim does not satisfy the prejudice prong of *Strickland*).

13

¶ 29　We also reject mother's argument that her appellate counsel's failure to obtain affidavits from Dr. Abbas and Dr. Brown constituted ineffective assistance.　Mother does not explain how these affidavits would have changed the proceeding's outcome.　She simply states that the affidavits would "prove that but for trial counsel's ineffective assistance of counsel, the outcome of the termination hearing would have been different."

¶ 30　Therefore, we conclude that mother's allegations are not sufficiently specific or compelling to constitute a prima facie showing of ineffective assistance of counsel requiring a remand. *See A.R.*, ¶ 63.

## IV.　Disposition

¶ 31　The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUDGE GRAHAM concur.