24CA0892 Peo in Interest of RAE 12-26-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0892
Montrose County District Court No. 19JV61
Honorable D. Cory Jackson, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of R.A.E., a Child,

and Concerning K.L.E.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

---

Martha Phillips Whitmore, County Attorney, Julie R. Andress, Deputy County Attorney, Montrose, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1　In this dependency and neglect action, K.L.E. (mother) appeals the judgment terminating her parent-child legal relationship with R.A.E. (the youth).  We affirm.

## I.　Background

¶ 2　Montrose County Health and Human Services (the Department) received a referral about the then-eight-year-old youth with concerns that mother had abandoned the youth and his older sister in Utah without making arrangements for their care.[1]  The Department attempted to support B.E. (father), who brought the children to Montrose County after being contacted by authorities in Utah.  However, there were also concerns in father's home, and about a month later, the Department filed a petition in dependency and neglect, alleging instability, abandonment, and endangerment by mother.

¶ 3　The juvenile court adjudicated the youth dependent and neglected and adopted a treatment plan for mother.  For a time, mother made progress on her treatment plan and the youth returned to her care for a trial home visit.  However, the youth was

---

[1] The sister was dismissed as a party before the termination judgment and is not part of this appeal.

removed again about eight months later. Almost a year after the second removal, the Department moved to terminate mother's parental rights. Three years after the petition was filed, the court granted the motion.

¶ 4 Mother appealed, challenging the juvenile court's jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA), §§ 14-13-101 to -403, C.R.S. 2024. A division of this court remanded the case to the juvenile court to "analyze its non-emergency jurisdiction, giving the parties an opportunity to present relevant facts and applicable legal arguments." *See People in Interest of R.A.E.*, (Colo. App. No. 23CA0524, Sept. 28, 2023) (not published pursuant to C.A.R. 35(e)).

¶ 5 On remand, after an evidentiary hearing and consultation with the Utah court, the juvenile court concluded that it had jurisdiction and reinstated the termination judgment.

¶ 6 Mother now appeals the termination of her parental rights and the juvenile court's jurisdictional findings made on remand.

## II. Jurisdiction Under the UCCJEA

¶ 7 Mother contends that the juvenile court erred by not complying with the remand order, erroneously analyzing

2

jurisdiction under the UCCJEA, and reinstating the termination judgment after obtaining jurisdiction. We aren't persuaded.

A.     Standard of Review and Applicable Law

¶ 8     We review de novo whether the juvenile court had subject matter jurisdiction under the UCCJEA. *People in Interest of S.A.G.*, 2021 CO 38, ¶ 21. We defer, however, to a juvenile court's factual findings informing the determination of jurisdiction and won't disturb such findings unless they are clearly erroneous. *Id.*

¶ 9     The UCCJEA "establishes a comprehensive framework that a Colorado court must follow to determine whether it may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state." *People in Interest of M.M.V.*, 2020 COA 94, ¶ 17.

¶ 10     A court has jurisdiction to make an initial child-custody determination if, as relevant here, the state is the child or youth's home state. § 14-13-201(1)(a), C.R.S. 2024. A court that makes an initial child-custody determination generally retains exclusive, continuing jurisdiction. § 14-13-202, C.R.S. 2024. However, a court that retains home state jurisdiction may "decline[] to exercise jurisdiction on the ground that a court of [another state] is the more

3

appropriate forum to determine the custody of the child under a provision of law adopted by that state that is in substantial conformity with section 14-13-207 or 14-13-208[, C.R.S. 2024].” § 14-13-201(1)(c).  As relevant here, section 14-13-207 allows a court to “decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum.”  § 14-13-207(1).

¶ 11    If a juvenile court errs by failing to analyze its jurisdiction under the UCCJEA before entering a judgment terminating parental rights, it may, on remand, correct the error.  *S.A.G.*, ¶ 58.  If the court “does acquire non-emergency jurisdiction after a full [UCCJEA] analysis, it may reinstate the termination judgment based on the existing record.”  *Id.*

### B.    Additional Background

¶ 12    As part of mother’s first appeal, a division of this court remanded the case “[b]ecause the juvenile court never determined which state was the child’s home state at the time of termination or otherwise followed the UCCJEA’s procedures to acquire non-emergency jurisdiction.”  *R.A.E.*, ¶ 29.

4

¶ 13     To remedy this error, on remand the juvenile court contacted the Utah court where the youth resided before being brought to Colorado by father. *See* § 14-13-110(1), C.R.S. 2024. The juvenile and Utah courts then held a joint evidentiary hearing. During that hearing, mother revealed — for the first time — that custody orders for the youth were entered in a domestic relations case in Utah. After mother's testimony, the Utah court located the divorce decree and custody determination, which had been issued four years before the petition in dependency and neglect was filed. Because the decree was from a different district in Utah, the Utah court asked to confer with the judge presiding over the domestic relations case before making any jurisdictional determinations.

¶ 14     A few weeks later, the Utah court filed a letter with the juvenile court. *See* § 14-13-110; *see also* Utah Code Ann. § 78B-13-110 (West 2024). The Utah court determined:

    1.    Utah was the youth's home state, had initial jurisdiction, and — because of the newly discovered child custody determination made in Utah — had exclusive and continuing jurisdiction over the child;

5

2. Utah was an inconvenient forum and Colorado was a more convenient forum because (a) the original Utah judge was retired and the replacement judge didn't have any knowledge of the youth; (b) the youth had resided in Colorado for "a significant period of time and most of the circumstances and facts involved in the Colorado case took place in Colorado"; (c) there was a significant distance from Montrose County to the Utah county where the initial determination was made; (d) most of the evidence was located in Colorado; and (e) Utah courts had not had any involvement with the family for eight years;

3. Colorado had a significant connection with the youth because all members of the youth's family resided there and had done so for several years; and

4. Utah declined to exercise jurisdiction.

¶ 15    The juvenile court then issued an order on remand. In that order, the court noted that, with the new information about the child custody determination made in Utah, "the question is now whether Colorado has jurisdiction to modify that determination."

The court noted that the Utah court had (1) found that Utah was the child's home state, (2) determined that Colorado was a more convenient forum, and (3) declined to exercise jurisdiction. The court then concluded that it had jurisdiction to modify Utah's initial determination and reinstated the termination judgment.

### C. Analysis

¶ 16    Mother first contends that the juvenile court erred by reaching beyond the remand instructions. Because the Utah custody determination was unknown to any of the participants in the case at the time of the appeal, the original remand order focused on the need for the juvenile court to determine if the youth had a home state at the time of the termination hearing. *R.A.E.*, ¶¶ 26, 30, *citing S.A.G.*, ¶¶ 26, 42-44. The remand order thus directed that "[if] the court determines that it had non-emergency jurisdiction at the time of the termination hearing, it shall specify which type of jurisdiction it is invoking." *R.A.E.*, ¶ 30. Mother contends that the juvenile court should have ended its analysis as soon as the Utah and juvenile courts determined that Utah was the child's home state. We disagree.

¶ 17    Once the existing custody determination became known to the juvenile court, the relevant question shifted from what, if any, state could claim home state status to whether Utah — the state that had exclusive continuing jurisdiction — was going to continue to exercise that jurisdiction.  *See* § 14-13-201(1)(b), 14-13-203(1), C.R.S. 2024; *see also People in Interest of B.H.*, 2021 CO 39, ¶¶ 3, 42.

¶ 18    To the extent there was any error by the juvenile court in continuing the UCCJEA analysis beyond the remand instructions, the error is harmless because the court properly followed the UCCJEA procedures once the Utah custody determination became known to the court and the parties.  Indeed, by doing so the juvenile court averted error and delay that would have resulted had the juvenile court uncritically followed the strict terms of the remand instructions, which this court crafted based on incomplete information.

¶ 19    Turning to the merits of the juvenile court's jurisdictional determination, based on the conferral with the Utah court and that court's findings, we conclude that the juvenile court properly determined that it had jurisdiction to modify the Utah custody

8

order. Under the UCCJEA, Utah had initial and continuing exclusive jurisdiction by virtue of having entered the original child custody orders. *See* § 14-13-202. That jurisdiction continues until one of a discrete number of circumstances arises. One such circumstance is that a court of another state — in this case, Colorado — obtains jurisdiction to modify the Utah child custody determination. *See* § 14-13-203(1)(a).

¶ 20    A Colorado court can acquire jurisdiction to modify the Utah child custody order only if (1) Colorado "has jurisdiction to make an initial determination under section 14-13-201(1)(a) or 14-13-201(1)(b)," and (2) Utah "determines . . . that a court of this state would be a more convenient forum under a provision of law adopted by that state that is in substantial conformity with section 14-13-207." § 14-13-203(1)(a). Here, both conditions were satisfied.

¶ 21    Section 14-13-201(1)(b) provides that Colorado has jurisdiction to make an initial child-custody determination if "a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum." During the conferral between the Colorado juvenile court and the Utah court, the Utah court declined to exercise jurisdiction

9

on the ground that Colorado would be a more convenient and appropriate forum. This vested Colorado with modification jurisdiction. *See* § 14-13-203(1)(a). And acquiring modification jurisdiction under the UCCJEA vests a juvenile court with jurisdiction to adjudicate a child dependent and neglected under the under the Children's Code, *see B.H.*, 2021 CO 39, ¶¶ 3, 45, which in turn gives the juvenile court jurisdiction to terminate parental rights, *see People In Int. of E.W.*, 2022 COA 12, ¶ 19 ("[T]ermination is not a new child-custody proceeding or a modification of a child-custody determination that requires the juvenile court to re-assess its jurisdiction."), *aff'd sub nom. R.W. v. People In Int. of E.W.*, 2022 CO 51. Thus, we also reject mother's contention that the termination of mother's parental rights was a separate or new "child-custody proceeding" under the UCCJEA requiring a separate jurisdictional analysis. *See S.A.G.*, ¶ 39 n.3 ("[I]n Colorado, a motion to terminate parental rights after a child has been adjudicated dependent and neglected is a request for a remedy, not the start of a second proceeding." (citing § 19-3-502(3)(a), C.R.S. 2024)).

¶ 22    Simply put, after conferral with the Utah court, the juvenile court properly concluded that it had jurisdiction to modify the Utah child custody order and that this modification jurisdiction included the authority to terminate parental rights.

¶ 23    Finally, mother contends that the juvenile court lacked jurisdiction to reinstate the termination judgment once it concluded that it didn't have jurisdiction at the time of the termination hearing. As best as we understand it, mother argues that the Colorado Supreme Court cases relied on by the juvenile court don't, to her satisfaction, explain why reinstatement of a termination judgment is possible. Regardless of mother's disagreement with the holdings in *S.A.G.* and *B.H.*, the Colorado Supreme Court has made clear that "if [a juvenile] court does acquire non-emergency jurisdiction [on remand], it may reinstate the termination judgment based on the existing record." *B.H.*, ¶ 83, *see also S.A.G.*, ¶ 58 ("If the juvenile court does acquire non-emergency jurisdiction after a full section 14-13-201(1) analysis, it may reinstate the termination judgment based on the existing record."). We, like the juvenile court, are obligated to follow these directives.

¶ 24     In sum, the juvenile court properly addressed its earlier errors related to jurisdiction under the UCCJEA and we discern no errors in the court's jurisdictional findings or conclusions on remand.

¶ 25     We turn next to mother's contentions concerning the termination judgment itself.

### III.     Termination of Parental Rights

### A.     Relevant Law and Standard of Review

¶ 26     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024; *People in Interest of E.S.*, 2021 COA 79, ¶ 10.

¶ 27     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  "We review the juvenile court's findings of evidentiary fact — the raw, historical data

underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts, including whether the Department engaged in reasonable efforts. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 28 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B. Reasonable Efforts

¶ 29 Mother contends that the juvenile court erred by finding the Department made reasonable efforts because the Department didn't provide adequate services after the end of the trial home visit. We aren't persuaded.

### 1. Preservation

¶ 30 As a preliminary matter, we address the guardian ad litem's and Department's contentions that mother didn't properly preserve her reasonable efforts claim for our review. Generally, issues not raised in the juvenile court may not be raised for the first time on appeal. *People in Interest of T.E.R.*, 2013 COA 73, ¶ 30. Mother

13

asserts that her statement that she "didn't have the support of anybody else but herself" during closing argument was sufficient to preserve the issue for our review.

¶ 31    We recognize that divisions of this court are split on whether a parent must challenge the department's reasonable efforts prior to the termination hearing to preserve the issue for appellate review. *Compare People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011) (holding that a parent's failure to object to services does not bar appellate review of a reasonable efforts findings), *with People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (declining to review a reasonable efforts finding because the parent failed to object to services provided before the termination hearing).  We need not resolve this question, however, because whether we conclude that mother has failed to preserve the issue for appellate review or whether we address the issue, the outcome is the same. *See People in Interest of C.N.*, 2018 COA 165, ¶ 14.

## 2.    Relevant Law

¶ 32    Before a court may terminate parental rights under section 19-3-604(1)(c), the county department of human services must make reasonable efforts to rehabilitate parents.  §§ 19-1-103(114),

14

19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care throughout the state of Colorado for children and youth who are in foster care or out-of-home placement." § 19-1-103(114).

¶ 33    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard. § 19-1-103(114). Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 34    In determining if the Department provided reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan. *S.N-V.*, 300 P.3d at 915. The parent is ultimately responsible for using services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

## 3. Additional Background

¶ 35 Mother testified that two and a half years after the petition was filed, she "went to go meet somebody" on New Year's Eve. She took the youth with her. Mother testified that she smoked marijuana laced with ketamine "along with other things" given to her by the man she was meeting. Mother testified that the man then took her and the youth to a hotel room, where the man sexually assaulted mother. Mother acknowledged that she "put [the youth] into a dangerous position."

¶ 36 That same weekend, the youth's sister reported to the Department that she ran away after seeing mother use illegal substances in their home.

¶ 37 Mother contacted the Department to report the youth's sister had run away but didn't report the New Year's Eve incident until the Department received a separate referral for the youth about that incident and confronted mother.

¶ 38 Because of these and other concerns about mother's substance dependence, the Department ended the trial home visit with mother and removed the youth from her care.

## 4. Analysis

¶ 39　The juvenile court found that the Department made reasonable efforts to provide rehabilitative services to mother, but the efforts weren't successful.  The court found that mother stopped engaging with metal health services after the trial home visit ended, and she "fail[ed] to diligently pursue" services regardless of whether the services were identified by her or referred by the Department.  The court found that, despite the Department's attempts to help mother pursue inpatient treatment, mother "failed to do her part to follow up with getting engaged in those services."

¶ 40　On appeal, mother contends that the Department failed to provide her with information and referrals for mental health, health care, or "trauma services" or other available assistance after she reported being sexually assaulted on New Year's Eve.  But the record belies mother's claim.  Mother testified that she was in "regular treatment" but stopped attending after New Year's Eve and the end of the trial home visit.  Mother reported that she was "in a very unstable place" and "just kind of gave up."

¶ 41　Mother had only sporadic contact with the Department after the trial home visit ended, and the caseworker sometimes couldn't

reach her for months at a time. At times mother reported being engaged in services, but when the caseworker followed up with the providers, she learned that mother had been discharged.

¶ 42 The caseworker testified that mother stopped engaging in mental health services before the trial home visit ended. After the youth was removed from the trial home visit, "almost immediately [the Department and mother] set up a plan for [mother] to reengage in services." Mother did reengage on a "very limited" basis to address her mental health.

¶ 43 The caseworker encouraged mother to pursue inpatient treatment options that could address both her mental health and substance dependence issues. The caseworker gave mother an application to an inpatient treatment program and offered to turn the completed application in for her, but mother didn't follow through.

¶ 44 By mother's own testimony, the caseworker provided resources for mental health services even after she relocated to Utah. Mother also testified that she completed a mental health evaluation with a provider in Utah, participated in regular

telehealth appointments with a therapist in Utah, and saw a provider for medication management.

¶ 45 Thus, the record reveals that the Department provided information and referrals for — and mother sporadically participated in — mental health services throughout the almost three years the dependency and neglect case was open, including after the end of the trial home visit. While we agree with mother's contention that she likely would have benefitted from health care and "trauma services" after the sexual assault, the record reveals that she reported pursuing such services on her own in Utah. More importantly for our analysis, these services are outside those contemplated by the Children's Code in light of mother's treatment plan. *See* § 19-3-208. We therefore discern no error with the juvenile court's conclusion that reasonable efforts were made to provide rehabilitative services to mother, but those services weren't successful.

## C. Less Drastic Alternative

¶ 46 Finally, mother contends that the juvenile court erred by finding there was no less drastic alternative to termination because mother "asked the court to order an allocation of parental

responsibilities (APR) to her foster-certified employer/friend until the time she was ready to resume care for [the youth] in [a] wholistic rehabilitation facility in California." We discern no error.

### 1. Relevant Law and Standard of Review

¶ 47 A juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). The court may consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. This determination is "influenced by a parent's fitness to care for [the] child's needs." *Id.* Long-term placement may not be a viable alternative to termination if the child needs a stable, permanent home that can be assured only by adoption. *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007).

¶ 48 Ultimately, for a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic

alternative must be the "best" option for the child.  *A.M.*, ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination.  *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record.  *B.H.*, ¶ 80.

## 2.    Analysis

¶ 49     At the hearing, mother testified that a couple weeks before the termination hearing she discovered an inpatient treatment program in California that accepted families.  Mother proposed that the juvenile court grant an APR to her friend in Utah who was offering to take the youth for ninety days until mother could become established in the inpatient treatment program.  Mother testified that her friend "would take [the youth] temporarily" until the youth could join her at the inpatient treatment program.

¶ 50     Mother's proposed solution was — by her own admission — temporary and not a less drastic alternative to termination of her parental rights.  Mother doesn't raise, and therefore we don't address, her proposal at trial as an argument that she could have become fit within a reasonable time.

¶ 51    In any event, the juvenile court found that there was no less drastic alternative that was either viable or would be in the youth's best interest.  The court found, with record support, that the youth "suffered from significant distress associated with an inconsistent visit schedule with [mother]" and that termination of mother's parental rights was necessary to meet the youth's physical, emotional, and mental health needs.

¶ 52    Because these findings are supported by the record, we won't disturb them on review.

IV.    Disposition

¶ 53    The judgment is affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.