25CA1204 Peo in Interest of KW 01-22-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1204
City and County of Denver Juvenile Court No. 23JV30749
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of K.W., T.L.L.S.C., and A.J.R.S.C., Children,

and Concerning A.W., M.E.W., and I.C.,

Appellants.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Dunn and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 22, 2026

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado, for Appellant A.W.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant M.E.W.

Elizabeth A. McClintock, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant I.C.

¶ 1   A.W. (mother) appeals the judgment terminating her parent-child legal relationships with K.W., T.L.L.S.C., and A.J.R.S.C. (the children).  In addition, M.E.W. (father M.E.W.) appeals the judgment terminating his parent-child legal relationship with K.W.  And I.C. (father I.C.) appeals the judgment terminating his parent-child legal relationships with T.L.L.S.C. and A.J.R.S.C.  We affirm.

## I.   Background

¶ 2   In August 2023, Denver Human Services (the Department) received multiple referrals raising concerns about mother's and father I.C.'s substance abuse.  Mother and father I.C. did not engage with the Department and refused to complete urinalysis testing "to confirm or negate the allegations of parental substance use."  One month later, the Department received a referral raising concerns that K.W. had been physically abused.  Father M.E.W. was incarcerated at the time.

¶ 3   The Department sought and was granted temporary legal custody of the children for placement with maternal grandparents.  The Department then filed a petition in dependency or neglect.  Three months later, the Department moved T.L.L.S.C. and

A.J.R.S.C. to a different kinship placement provider at maternal grandparents' request. Shortly thereafter, the Department removed K.W. from maternal grandparents' home due to concerns about maternal grandmother's sobriety. The juvenile court adjudicated the children dependent and neglected and adopted treatment plans for the parents. Among other provisions, mother's and father I.C.'s treatment plans required them to (1) complete substance abuse and mental health evaluations and follow all treatment recommendations; (2) submit to drug testing; (3) cooperate in family therapy or attachment therapy with the children if recommended by the children's therapists; (4) learn and use healthy communication with the children and discipline the children in an emotionally, physically, and mentally safe manner; and (5) attend all scheduled parenting time. Father M.E.W.'s treatment plan required him to (1) participate in programs offered at the correctional facility while in custody; (2) comply with all conditions of parole once released; (3) refrain from criminal activity; (4) attend all scheduled parenting time; and (5) learn K.W.'s specific developmental and mental health needs by attending all school meetings; doctor appointments; and,

2

if appropriate, therapy appointments when permitted by the correctional facility or after his release.

¶ 4    The children's guardian ad litem (GAL) later moved to terminate mother's, father M.E.W.'s, and father I.C.'s parental rights, and the Department joined and agreed to prosecute the motion. The juvenile court conducted the contested termination hearing over six days, spanning three months. Twenty months after the Department filed the petition, the juvenile court granted it and terminated the various parent-child legal relationships.

## II.    Fitness Within a Reasonable Time

¶ 5    Mother and father M.E.W. contend that the juvenile court erred by finding that they could not become fit within a reasonable time. We disagree.

### A.    Applicable Law and Standard of Review

¶ 6    A juvenile court may terminate a parent's rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's

conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 7 A parent is unfit if the parent is unable or unwilling to give a child reasonable parental care. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 23, 524 P.3d 1209, 1216. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 9, 486 P.3d 1201, 1204. A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 8 A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). What constitutes a reasonable time to comply with a treatment plan is necessarily fact specific and may vary from case to case. *Id.* But a reasonable time is not an indefinite time; it must

be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 25, 524 P.3d at 1216.

¶ 9     In determining whether a parent's conduct or condition is likely to change and whether the parent can become fit in a reasonable time, the juvenile court may consider, among other factors, whether any change in the parent's behavior occurred during the pendency of the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). When a parent has made little to no progress on a treatment plan, the court need not give the parent additional time to comply. *See People in Interest of R.B.S.*, 717 P.2d 1004, 1006 (Colo. App. 1986).

¶ 10     In addition, when, as in this case, a child is under six years old at the time the petition in dependency or neglect is filed, the juvenile court must consider the expedited permanency planning (EPP) provisions, which require placement in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

¶ 11     A juvenile court's termination of parental rights presents a mixed question of law and fact because it involves application of the

termination statute to evidentiary facts. *S.R.N.J-S.*, ¶ 10, 486 P.3d at 1204. We review the court's factual findings for clear error, but we review de novo the court's legal conclusions based on those facts. *Id.* at 1204-05.

¶ 12    The credibility of the witnesses, as well as the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from the evidence, are all subject to the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### B.    Analysis

¶ 13    The juvenile court concluded that the parents could not become fit within a reasonable time. In its analysis, the court gave primary consideration to the children's physical, mental, and emotional conditions and needs, including their significant trauma history and need for permanency. The court noted that mother and father M.E.W. had "lengthy" histories with child welfare departments and, despite the services provided to them in this and prior cases, they had not demonstrated the ability to be sober and available parents to their children.

¶ 14    The record supports the court's findings.  The court took judicial notice of the prior dependency and neglect cases involving mother and father M.E.W., which showed that K.W. and T.L.L.S.C. had been removed from mother's care on two prior occasions and returned to her care only approximately seven months before the Department filed the petition in this case.  During her testimony, mother acknowledged that she had been involved with child welfare departments "[o]n and off" for the preceding twelve years and that a department of human services either previously or currently had custody of ten of her children.  Father M.E.W. described his relationship with K.W. as "limited" due to his incarceration history.

¶ 15    In addition, despite mother's engagement in substance abuse treatment, she tested positive for methamphetamine less than one month before the termination hearing began.  And less than two months later, a shelter worker found methamphetamine in mother's possession.  The caseworker continued to have concerns about mother's sobriety based on her inconsistent drug tests, recent relapse, and criminal charge for possession of a controlled substance.  The caseworker opined that, even with more time, mother was unlikely to resolve these concerns.

¶ 16    Similarly, the caseworker testified that, despite the Department's efforts, father M.E.W. continued to have a limited relationship with K.W. and struggled to engage in visits with K.W. when he was not in custody.  Although father M.E.W. was incarcerated for the first ten months of the case, and the jail did not cooperate with the Department's attempts to arrange virtual visits, after his release, he attended only one in-person visit with K.W. during the four months before his rearrest and reincarceration. Even though father M.E.W. attended virtual visits during his second period of incarceration and received positive feedback from the supervisor, at the time of termination, he had been out of custody for about two months but had not responded to the caseworker's efforts to resume in-person parenting time.  As a result, the caseworker had reservations about father M.E.W.'s ability to reunify with K.W. even with more time.  Moreover, considering the length of the case, placement changes, and the children's significant needs, the caseworker opined that the children could not wait any longer for permanent placement.  The caseworker explained that the children needed permanency and a prompt resolution of the case.

¶ 17　Nevertheless, mother and father M.E.W assert that the juvenile court erred by finding that they were unlikely to become fit within a reasonable time because their significant progress warranted granting them additional time.  For example, mother notes that she completed substance use disorder treatment and was in the process of obtaining housing, working on her sobriety, and progressing in child-parent psychotherapy (CPP).  Likewise, father M.E.W. contends that he made "significant progress" in building a bond with K.W.

¶ 18　In terminating mother's and father M.E.W.'s parental rights, the juvenile court acknowledged their periods of compliance with their treatment plans.  Specifically, the court found that mother had engaged in services, obtained a housing voucher, parented safely during supervised visits, and remained in good communication with the professionals throughout the case.  And the court acknowledged father M.E.W.'s in-person visit with K.W. and his engagement in virtual family time during his second incarceration.  Nonetheless, the court found, with record support, that mother and father M.E.W. were unsuccessful in addressing the key components of their respective treatment plans, they remained

9

unable to meet the emotional and mental health needs of the children, and their conduct or conditions were unlikely to change within a reasonable time. Mother and father M.E.W. effectively ask us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do. *See S.Z.S.*, ¶ 29, 524 P.3d at 1217.

¶ 19 Mother also asserts that the record did not support the court's findings that CPP would take at least a year and could be unsuccessful, and that the court erred by relying on these inaccurate findings in concluding that she could not become fit within a reasonable time. We are not persuaded.

¶ 20 We acknowledge that mother began engaging in CPP during the last two to three months of the case and that a parent may be reunified with a child before full completion of the CPP process, which takes an average of one year. Multiple therapists provided CPP therapy to the children. K.W.'s CPP therapist explained that the duration of the CPP process depended on multiple factors, including the caregiver's ability to understand and process the child's symptoms and trauma. All three children had "significant" trauma and needed consistent, ongoing therapy, even after a

potential return home. The CPP therapists expressed concern that the children would be negatively affected if they returned home and could not continue in therapy. And based on mother's lack of engagement for much of the case, the CPP therapist for T.L.L.S.C. and A.J.R.S.C. expressed doubts about mother's ability to meet the children's needs. K.W.'s CPP therapist opined that mother would need to consistently attend weekly meetings for a year to progress through CPP. The caseworker said she did not believe that waiting even six more months to resolve permanency was in the children's best interests. Because the record supports the court's findings that mother and father M.E.W. could not become fit within a reasonable time, we have no basis to disturb those findings. *See id.*

### III. Less Drastic Alternatives

¶ 21 Mother and father M.E.W. assert that the juvenile court erred by finding there was no less drastic alternative to termination. Specifically, they argue that an allocation of parental responsibilities (APR) to maternal grandparents was a viable less drastic alternative. We disagree.

### A. Applicable Law and Standard of Review

¶ 22 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). In considering less drastic alternatives, the court must give primary consideration to the children's physical, mental, and emotional conditions and needs. § 19-3-604(3).

¶ 23 In deciding whether there is a less drastic alternative, the juvenile court may consider various factors, including (1) whether a less drastic alternative is available, *People in Interest of D.P.*, 160 P.3d 351, 356 (Colo. App. 2007); (2) whether the children are bonded to the parent, *D.P.*, 181 P.3d at 408-09; (3) whether permanent placement with a relative would provide adequate permanence and stability for the children, *People in Interest of T.E.M.*, 124 P.3d 905, 910-11 (Colo. App. 2005); and (4) whether the alternative placement option favors adoption rather than an APR, *People in Interest of S.N-V.*, 300 P.3d 911, 920 (Colo. App. 2011). It is within the juvenile court's discretion to determine how to weigh the various factors, so long as the record supports the court's findings. *A.J.L.*, 243 P.3d at 250.

¶ 24    A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27, 480 P.3d 682, 688. Hence, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32, 480 P.3d at 689. Under those circumstances, we must affirm the court's decision if the record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80, 488 P.3d 1026, 1042.

### B.    Analysis

¶ 25    The juvenile court found that an APR to maternal grandparents was not a viable less drastic alternative because they had indicated they were unable to care for the children. The court further concluded that an APR or guardianship, in general, would not provide the children with sufficient permanency because it could "perpetuate the children's anxiety and trauma symptoms indefinitely."

¶ 26    The record supports these findings. The caseworker expressed concern about maternal grandparents as a placement option because of their prior inability to care for all the children

simultaneously. And the caseworker noted recent concerns regarding maternal grandmother's sobriety. Furthermore, the CPP therapist for T.L.L.S.C. and A.J.R.S.C. emphasized their need for "consistent predictable" caregivers. And K.W.'s CPP therapist described the intense nature of his separation anxiety. Considering the children's higher than average needs, past placement changes, and K.W.'s and T.L.L.S.C.'s prior removals from mother's care, the caseworker opined that the children "desperately need[ed] [the] permanency and . . . stability that adoption [could] offer."

¶ 27 Nevertheless, mother and father M.E.W. argue that an APR to maternal grandparents was in the children's best interests because they were an appropriate placement who would have allowed the children to maintain their bonds with each other and their parents. Although the Department placed one of the children's older siblings, C.F.W., in maternal grandparents' care during the termination hearing, the caseworker explained that C.F.W. was differently situated than K.W., T.L.L.S.C., and A.J.R.S.C. because of her age, behavior, numerous placement changes, and lack of a possible permanent placement. For these reasons, the Department took "a little bit of a risk" and placed C.F.W. with maternal grandparents in

14

the hope of establishing much-needed stability for her. Because K.W., T.L.L.S.C., and A.J.R.S.C. were in possible permanent placements and maternal grandparents had previously expressed an inability to care for the children and C.F.W., the caseworker said she did not believe placement with maternal grandparents was in the children's best interests. *See People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo. App. 2006) ("[I]n deciding whether . . . less drastic alternatives exist, a trial court may recognize differences between the parents, as well as differences between the children, and base its decision upon the best interests of the children.").

¶ 28 And even though the court did not specifically consider the impact that termination would have on the children's relationships with each other, it did acknowledge that the children would likely suffer a loss as a result of the termination. But the court ultimately concluded that any potential loss did not outweigh its other findings and that termination was in the children's best interests. We cannot reweigh the evidence or substitute our judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29, 524 P.3d at 1217.

¶ 29 We are also unpersuaded by father M.E.W.'s argument that the juvenile court erred by declining to enter an APR to the

placement providers because nothing indicated they would refuse to accept an APR.  This fact, without more, did not render an APR a viable less drastic alternative.  Rather, in concluding that an APR was not in the children's best interests, the court properly considered their need for stability and permanency in conjunction with the placement providers' preferences for adoption.  *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 29, 463 P.3d 330, 335 ("In considering less drastic alternatives, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs."); *see also S.N-V.*, 300 P.3d at 920 ("Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption.").

¶ 30    Because the record supports the juvenile court's finding that there was no less drastic alternative to termination, we cannot disturb it.  *See B.H.*, ¶ 80, 488 P.3d at 1042.  Mother also argues that the juvenile court erred by finding that termination was in the children's best interests.  We reject this argument, as well, in light of our rejection of mother's arguments that she was progressing in

16

her treatment plan and the court failed to consider the benefits to the children of maintaining their sibling and parental bonds.

## IV.    Due Process

¶ 31    Father I.C. asserts that the juvenile court violated his due process rights by (1) holding the termination hearing on six separate days over the span of more than three months; and (2) considering evidence from a hearing at which he did not participate.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 32    Because "[p]arents have a constitutionally protected liberty interest in the care, custody, and management of their children," *A.M.*, ¶ 17, 480 P.3d at 687, the termination of the parent-child legal relationship must satisfy due process by providing "fundamentally fair procedures," *People in Interest of J.G.*, 2016 CO 39, ¶ 20, 370 P.3d 1151, 1158 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)).  "Under this principle, a parent must be provided with 'notice of the allegations in the termination motion, the opportunity to be heard, the opportunity to have counsel if indigent, and the opportunity to call witnesses and engage in cross

17

examination.'" *People in Interest of E.B.*, 2022 CO 55, ¶ 16, 521 P.3d 637, 640 (quoting *A.M.*, ¶ 18, 480 P.3d at 687).

¶ 33      We review procedural due process claims de novo. *People in Interest of R.J.B.*, 2021 COA 4, ¶ 26, 482 P.3d 519, 524. But a parent cannot prevail on a due process claim absent a showing of harm or prejudice. *People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007).

## B.      Additional Background

¶ 34      The court initially set the termination hearing in January 2025 based on a request from mother's counsel. During the pretrial conference, the court added a second day, February 12, 2025, for the hearing based on concerns that one day would be insufficient. One week before the January 2025 hearing date, father I.C.'s counsel moved for a continuance, which the court granted. The court ordered that the hearing would begin on February 12, 2025, and later added two additional hearing dates — February 26 and March 14, 2025. Father I.C. requested a continuance — which the court denied — at the start of both February hearing dates. During the third day of the termination hearing — March 14, 2025 — the court scheduled three additional hearing dates — April 23, April 25,

18

and May 21, 2025 — to ensure the parties would have sufficient time to present their evidence. The court conducted the hearing over all three additional scheduled days, and the hearing concluded on May 21, 2025.

¶ 35 During the termination hearing, mother filed a forthwith motion requesting that C.F.W. be returned to maternal grandparents' care from the foster home to which she had been moved. The court held a hearing on that motion on April 7, 2025 (the April hearing). The caseworker and maternal grandfather testified at the hearing, but neither father I.C. nor his counsel appeared at or participated in it. In its termination order, the juvenile court acknowledged their nonparticipation at the April hearing, but it noted that it did not consider evidence from that hearing when deciding to terminate father I.C.'s parental rights.

### C. Length of the Termination Hearing

¶ 36 Father I.C. asserts that he preserved his claim regarding the length of the termination hearing by arguing during his closing argument that the extended length of the hearing violated his due process rights. But at no point during the pendency of the hearing did he object to a continuation of the hearing, additional hearing

dates, or the length of the hearing. Indeed, father I.C.'s counsel requested continuances of the first three scheduled termination hearing dates. Thus, we conclude that father I.C. did not preserve these arguments. *See People in Interest of O.J.S.*, 844 P.2d 1230, 1233 (Colo. App. 1992) (requiring a timely, specific objection in the trial court to preserve an issue for appellate review).

¶ 37 We similarly reject father I.C.'s argument that the duration of the termination hearing exceeded the statutory time limit for a hearing in an EPP case. Specifically, father I.C. asserts that section 19-3-602(1), C.R.S. 2025, requires that, in EPP cases, termination hearings be held within 120 days of the date of filing of the termination motion and that the hearing in this case did not conclude until 237 days from the filing date. But father I.C. never raised this argument in the juvenile court. *See People in Interest of V.W.*, 958 P.2d 1132, 1134 (Colo. App. 1998) (declining to address an argument raised for the first time on appeal); *see also Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) (holding that to properly preserve an argument, the party must have "presented to the trial court the sum and substance of the argument it now makes on appeal"). In addition, we note that 120

days after the filing of the termination motion was January 24, 2025. As noted above, father I.C. requested continuances of the termination hearing both before and after that date. Consequently, he forfeited his right to challenge the court's compliance with the statutory time frames for an EPP case. *See People v. Rediger*, 2018 CO 32, ¶ 40, 416 P.3d 893, 902 (defining forfeiture as "the failure to make the timely assertion of a right" (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).

¶ 38    Moreover, even if father I.C. had preserved this argument, we do not see how the length of the termination hearing prejudiced him. Father I.C. asserts that the extended duration of the hearing prejudiced him because it (1) caused the evidence of his treatment plan progress to become "stale"; (2) enabled the People to present evidence of his recent setbacks; and (3) allowed the children to strengthen their bond with the foster family. We are unpersuaded because father I.C. does not demonstrate how the length of the hearing, in and of itself, caused these changes in circumstance. Further, father I.C. fails to establish that, but for the length of the termination hearing, the outcome of the case would have been different. Rather, his lack of participation in the CPP process,

21

inconsistent family time attendance, and concerns related to his sobriety throughout the case, as well as his recent incarceration, contributed to the court's finding that he was unfit. Moreover, father I.C. had the same opportunity as the other parties to present evidence, including any recent or new evidence, in support of his opposition to the termination motion. We must reject father I.C.'s argument regarding the length of the hearing in the absence of prejudice. *J.A.S.*, 160 P.3d at 262.

### D. Evidence from April 2025 Hearing

¶ 39     As a preliminary matter, we disagree with the Department's and GAL's argument that father I.C. failed to preserve his contention that the juvenile court erred by considering evidence presented at the April 2025 hearing. But father I.C. could not have raised this argument until after the court ruled. A party need not object to a court's findings to preserve a challenge to those findings. *In re Marriage of Crouch*, 2021 COA 3, ¶ 17, 490 P.3d 1087, 1091; *see* C.R.C.P. 52. Accordingly, we consider, and reject, father I.C.'s assertion of error regarding the evidence of the April hearing.

¶ 40     Father I.C. acknowledges the juvenile court's statement that it did not consider the evidence presented at the April 2025 hearing

22

when adjudicating the petition to terminate his parental rights. Even so, he asserts that the juvenile court "would have had to consider the testimony" when finding there were no less drastic alternatives to termination. Specifically, he contends that (1) "[t]here was very little testimony offered at the termination hearing about the maternal grandparents' viability as a possible placement"; and (2) the only support for the caseworker's opinion that placement with maternal grandparents was not in the children's best interests was the length of time the children spent in, and lack of safety concerns at, their other placements. But this argument disregards the caseworker's testimony at the termination hearing, discussed above, detailing her concerns about maternal grandparents as a placement option. Because father I.C. had notice of the termination hearing and his counsel was able to present and question witnesses during the hearing, we discern no due process violation. *See E.B.,* ¶ 16, 521 P.3d at 640.

¶ 41 Even if the juvenile court erroneously considered evidence from the April 2025 hearing, there was no prejudice to father I.C. The court found that an APR or guardianship to any placement, not just maternal grandparents, was not in the children's best interests.

In other words, regardless of the suitability of maternal grandparents as a placement option, or the evidence on which the court relied to reach this conclusion, the court determined that termination was in the children's best interests. Thus, father I.C.'s due process claim fails absent a showing of actual prejudice. *See J.A.S.*, 160 P.3d at 262.

## V.  Disposition

¶ 42     The judgment is affirmed.

JUDGE DUNN and JUDGE KUHN concur.